OPINION OF THE COURT
Fuchsberg, J.
The defendant William Piazza stands convicted by a jury of arson in the third degree, conspiracy in the second degree and criminal solicitation in the second degree, all relating to the incendiary destruction of a commercial building owned by his father, Sam Piazza.[1] The Trial Judge had imposed consecutive indeterminate terms of seven and three years on the arson and conspiracy counts respectively and granted an unconditional discharge on the one for solicitation. On review, the Appellate Division modified the sentences so they would run concurrently; it otherwise affirmed the judgment of conviction.
Defendant’s arguments on this appeal essentially fall into two categories. One is that the evidence was insufficient to support the verdict on the charge of arson; the other is that the trial was marked by a series of errors, which, taken individually or in combination, require a new trial of all the charges on which he was found guilty. For the reasons which follow, we are of the opinion that the indictment for arson should have been dismissed, but that in all other respects the order of the Appellate Division was correct.
 At the heart of the People’s case was a theory that the Piazzas had conspired to cause the fire and accompanying explosion to permit the father to terminate an unprofitable lease held by a unit of the Strauss Stores Corporation. To make out its prima facie case of conspiracy and of solicitation, *157 the prosecution, among other things, produced direct proof from Richard Masto and William Yezzi, partners in an auto repair business, to establish that, in the late summer and early fall of 1972, both Sam and William Piazza had repeatedly, though unsuccessfully, tried to induce them to blow up the store for a payment of $10,000. To spell out the arson and to link the conspiracy with the actual event, which occurred approximately a half year after Masto and Yezzi had been solicited, the District Attorney went on to present evidence that the human instrument through which the conspiracy then acted was one John Donnelly, whose death in the ensuing conflagration led to the original felony murder charge. With Donnelly dead, in the main the evidence of the arson took the form of a recitation of declarations made by the decedent to a Peter Kearns. This hearsay evidence was admissible because Donnelly’s utterances had been against his penal interest (see, generally, People v Maerling, 46 NY2d 289, 295-299; People v Settles, 46 NY2d 154, 166-170).
Kearns’ story, the District Attorney tells us, was not offered to prove that William Piazza committed the arson, but only to establish that the building had been demolished by criminal agency rather than by accident. The witness’ account began with his assertion that he encountered Donnelly, an old friend, at a neighborhood bar at about 10 p.m. on the night of the arson, March 15, 1973. According to Kearns, Donnelly said he had "to do a job” and prevailed upon his friend to drive him to the building where it was to be done. En route, as Kearns recounted to the jury, Donnelly reminded him that several months earlier "I was telling you I had to take care of a building” and then confided that "tonight I have to do it”. At about the time they arrived at the location, Donnelly is also supposed to have pointed out the "targeted” premises; explained that the plan was to spill oil on the bottom of the basement floor as an accelerant; commented "I see the boys are doing their job” when they came upon an oil truck in front of the building; pointed to a door in the rear that he said was to have been unlocked for him; and mentioned that he was doing the job for "Sam the owner” and had done another job for "the same party” on a prior occasion. Kearns completed his version of the evening’s adventures by describing how, after leaving Donnelly, he had driven but a short distance before the sound of a blast caused him to return, only to find the building ablaze. It was not until months later, after *158 Donnelly’s body was found beneath the postfire rubble, that Kearns admitted to knowledge of the events of that night.
Consistent with the fact that this testimony at no time directly implicates William Piazza (as distinguished from Sam Piazza) in the arson, both sides agree that whether a prima facie case of arson was made out depends, as in most prosecutions for that crime, solely on circumstantial evidence (People v Reade, 13 NY2d 42, 46). We therefore turn immediately to consideration of its sufficiency.
' In so confining our inquiry on this point, we are not unaware of those cases, which, on an agency rationale, advance the theory that, since a conspirator is liable for the acts of his coconspirator in furtherance of the conspiracy (see, e.g., People v Salko, 47 NY2d 230, 237), the conspirator may be deemed an accomplice in the criminal acts committed by his coconspirator (see People v Collins, 234 NY 355, 361; Shapiro v Ferrandina, 478 F2d 894). On the other hand, in this connection we also observe that the statute defining accomplice liability, though it specifically enumerates a variety of other criminal conduct, nowhere mentions "conspiring” as a predicate for liability (Penal Law, § 20.00). However, we have no occasion to rule on that question here. For, as already indicated, the People did not elect to proceed on the assumption that a conspirator-accomplice approach was in order, and, holding to the path it thus pursued, requested no such charge. The trial court, for its part, delivered none. Rather, it specifically instructed the jury that the defendant might be convicted of the conspiracy count and yet be found innocent of the arson. So, the issue having implicitly been kept out of the case by common consent of the parties and the Trial Judge, it is not now to be inserted on our initiative (People v Morhouse, 21 NY2d 66, 75; People v Robinson, 284 NY 75, 81; cf. Martin v City of Cohoes, 37 NY2d 162, 165).
 Returning then to examine the circumstantial evidence, we note at the outset the oft-stated rule that, in order to establish a defendant’s guilt beyond a reasonable doubt on the basis of exclusively circumstantial proof, "the hypothesis of guilt should flow naturally from the facts proved, and be consistent with them; and the facts proved must exclude 'to a moral certainty’ every reasonable hypothesis of innocence” (People v Benzinger, 36 NY2d 29, 32; People v Wachowicz, 22 NY2d 369, 372). Put another way, such evidence "is of no value if consistent with either the hypothesis of innocence or *159 the hypothesis of guilt” (People v Suffern, 267 NY 115, 127; People v Montanez, 41 NY2d 53, 57). Thus, though in the affirmed posture in which the present case comes to us the proofs are to be taken most favorably to the People, it is with the caveat that the facts and inferences to be drawn from them must be "so reasonable that they cannot be confused with mere conjecture or suspicion” (People v Castillo, 47 NY2d 270, 277). This stern rule does not proceed from any assumption of inherent weakness of circumstantial evidence vis-á-vis direct evidence, but from the need to insure that the "careful reasoning” necessary to knit together the multiple strands of a skein of circumstantial evidence is not abandoned for unwarranted and, hence, impermissible conclusions "based on probabilities of low grade or insufficient degree” (People v Cleague, 22 NY2d 363, 367; accord People v Kennedy, 47 NY2d 196, 201-203).
To meet these criteria, three facets of the proof served to buttress the prosecution’s submission that William Piazza remained, to the end, an active participant in the carrying out of the arson for which a conspiracy originally was formed some six months earlier. These were (1) that Sam and the defendant had visited the basement of the building on the late afternoon of the fire; (2) that, as Donnelly’s wife testified, on the evening in question her husband left their house saying he had "a job to do for the Piazzas”, that Sam Piazza called later that evening to inquire after her husband, and that, when she called the defendant the following morning, she was informed that her husband had never appeared; and (3) that, on the morning after the fire, the defendant operated a payloader to level the site at the bottom of which Donnelly’s body ultimately was found.
But the power of these baldly stated proofs was dissipated by other related circumstances, largely unimpeachable, which were developed at trial. For instance, as to the appellant’s and his father’s presence in the basement, proof elicited from the People’s own witnesses established that, as recently as February 6, 1973, only five weeks before the conflagration, a New York City Building Department health code violation order had been served on Sam Piazza, as owner of the building, because, without his leave, certain of his tenants in these commercial premises had been using the basement for residential purposes, and that, to the elder Piazza’s knowledge, the offending tenants themselves had been served with viola *160 tion orders for the continuance of this illegal practice on the very day before the fire. Moreover, on the occasion the Piazzas were observed in the basement by the Strauss employee who saw them there, he gathered from their conversation that they were engaged in disconnecting the supply of gas and electricity in order to discourage the tenants’ unlawful occupancy. Against this background, and especially in the absence of any testimony that connected it in any way with the arson, the bare fact of defendant’s visit to the basement cannot be said to exclude a reasonable hypothesis of innocence.
The second item from which it is claimed the inference of guilt could ineluctably flow came in the form of hearsay, the admissibility of which is not our concern, since it went in without exception (People v Robinson, 36 NY2d 224). It consisted of Donnelly’s statement, made to his wife on the evening of the fire, that he was going "to do a job for the Piazzas”. The sinister interpretation placed upon this is countered by the fact that Donnelly had in the past done odd jobs, including engine repairs, for both Piazzas, and also by Kearns’ admission during cross-examination that Donnelly had told him he had a "motor job” to do. Indeed, this tended to confirm defendant’s own statement that Donnelly failed to report to him as per prearrangement to work on an engine at another place on the night of the arson.
Furthermore, while Donnelly’s reference to "the Piazzas”, taken literally, included the defendant, it was not unreasonable to interpret it as shorthand for "Sam Piazza” or some project related in some way to the family affairs in which the father appears to have been the possessory as well as the dominant figure. Noteworthy too was Mrs. Donnelly’s testimony that, on the preceding evening, Sam Piazza telephoned for her husband and that, early the next evening, on the date of the fire, Donnelly had gone "to see what Sam wanted”. And, later that night, according to Mrs. Donnelly, it was Sam, not William, who called to inquire about her husband’s whereabouts. Thus, given this complexion, Donnelly’s remark can hardly be deemed proof that " 'points with almost unerring certainty’ to defendant’s guilt” (People v Wachowicz, 22 NY2d 369, 373, supra, citing People v De Martini, 218 NY 561, 595).
The prosecutor chose to interpret the third circumstance, defendant’s bulldozing of the debris at the site of the fire on the day after its occurrence, as indicating an attempt to *161 conceal Donnelly’s body or any evidence that the fire was incendiary in origin. However, absent an iota of evidence that either the defendant, the many firemen who clambered over the area or any of those who promptly responded to officially survey its condition that morning had an inkling that a body lay under the debris, this point at best had to be heavily laden with speculation. Beyond that, the evidence at trial showed that, on the morning after the fire, the defendant, who appears to have been exposed to liability at an earlier time by the collapse of another structure, had been told by a Chief Inspector of the Department of Buildings and by other city personnel that a leaning wall still standing after the explosion presented an immediate danger which had to be removed to secure the area; and, while none of these authorities may have intended that the debris be plowed into the excavation, officials in whose presence it was carried out made no effort to halt or deter this activity. The defendant’s behavior after the fire may, therefore, be viewed as consistent with his innocence (cf. People v Lewis, 275 NY 33, 38 [no inference of guilt may be drawn from defendant’s failure to attempt to extinguish fire in barn and instead protect his home]).
Nor can proof of defendant’s participation in the arson as such be deduced from the meetings with Masto and Yezzi. That this is competent evidence from which defendant’s guilt of the conspiracy could be inferred (see People v Colascione, 22 NY2d 65, 74-75; People v Gross, 51 AD2d 191, 195), and the solicitation charge established, is not disputed. But this conspiracy, operating fully half a year before the burning of the building, does not create more than an inference of some undefined involvement by the defendant in the eventual arson itself. In short, neither on this account nor on the basis of the other circumstantial evidence is the defendant so connected with the actual commission of the arson to the degree that his conduct can be said to negate a reasonable and innocent explanation. We find any inference of guilt drawn to be within the range of conjecture (see People v Cleague, 22 NY2d 363, 366-367, supra).
Accordingly, for the jury to have found the defendant guilty of the arson, it had to have done so on the strength of a few facts, which, viewed most favorably to the People, must be considered inadequate as a matter of law to support an ultimate conclusion of guilt beyond a reasonable doubt. Though, concededly, "they may furnish some grounds of suspi *162 cion” (People v Lewis, 275 NY 33, 42, supra), the episodes described, taken in true perspective, were so riddled with "subjective inferential links based on probabilities of low grade or insufficient degree” (People v Cleague, supra, p 367) that, on examining the evidence as a whole, the conclusion is inescapable that the circumstantial evidence fell below the standards for determining its sufficiency.
We pass now on the assignments of reversible error on which defendant stakes his claim that the conspiracy and solicitation convictions also must be overturned. First, we reject the assertion that the prosecutor deprived the defendant of a fair trial by allegedly withholding information he was bound to disclose while the witness Kearns was on the stand. By no means does the record sustain such an accusation.
During Kearns’ cross-examination, defense counsel’s inquiry as to whether he had received immunity elicited that the witness was told only that "regardless of what I did in the past * * * I should tell the truth”. Dissatisfied with this answer, presumably because he thought it either unresponsive or evasive, counsel repeated the question, and Kearns replied this time in the negative. That answer turned out to be but a fleeting one, for, to the follow-up query "Do you know what immunity is?”, Kearns’ more measured response was "I don’t know * * * No guilt or something like that”. Though the equivocal nature of this answer certainly left the path open to further questioning, defendant’s trial counsel, who the record discloses to have been experienced, able and thorough, was apparently satisfied with the response and elected to drop this line of examination, indeed never to return to it. The prosecutor, who, incidentally, was not the same. Assistant District Attorney who had appeared at the Grand Jury presentment, also let the matter lie. In fact, the record of the hearing held on a posttrial motion based on newly discovered evidence informs us (see infra, n 2) that when Kearns appeared before the Grand Jury, an Assistant District Attorney had advised the witness that he would not be prosecuted if he told the truth.
 The defendant would have us place these circumstances within the compass of People v Savvides (1 NY2d 554, 557). There we minced no words in declaring that, in the face of a prosecutor’s knowledge that a witness’ testimony denying that a promise of leniency was given is false, he or she has no *163 choice but to correct the misstatement and to elicit the truth. This is no less than an effectuation of the principle that "nondisclosure of evidence affecting credibility falls within” the rule enunciated in Brady v Maryland (373 US 83) (Giglio v United States, 405 US 150, 154, quoting Napue v Illinois, 360 US 264, 269; People v Cwikla, 46 NY2d 434, 441). It therefore implies no relaxation of our unwillingness to tolerate any departure from that standard when we observe that, unlike the witness in Sawides, Kearns was not the target of the Grand Jury inquiry; that there is nothing to indicate that his co-operation was bargained for, directly or indirectly; and that the existence of such an understanding is not to be inferred simply from the fact that he did not waive the automatic immunity which otherwise is conferred by statute on all witnesses who testify before a Grand Jury (see CPL 190.40, 190.45).
Moreover, the sequence of questions and answers that brought the matter to the fore presented the jury, overall, not with a categorical denial (see People v Mangi, 10 NY2d 86, 90), but, at worst, with a confused picture as to whether or not immunity had been granted and what that legal term meant. Add the patent indecisiveness of the witness’ answers and defense counsel’s failure to request of either court or prosecutor that he be supplied with information that would have removed any uncertainty (see People v Cwikla, supra, pp 441-442). In this frame of reference, we do not fault the prosecutor for failing to volunteer a clarification. Rather, it is not too much to assume that astute defense counsel, far from any thought of being victimized by the People, was happy to leave things in a posture which allowed him a range of inferences from which to mount a later argument. Similarly, from the prosecution’s standpoint, the decision to let the matter rest need have represented nothing more than an advocate’s perfectly understandable disinclination to open the door to an adversary’s further sparring with an indecisive witness. We conclude, therefore, that what now is attacked as prosecutorial misconduct, actually was no more than a reflection of the defendant’s own choice of trial tactics.
 We next consider another prong of the defendant’s reversible error position. This too features Kearns. Early in the investigation, when this witness’ friendship with Donnelly became known, he signed an affidavit in which he swore that he knew nothing of the fateful fire and that he had last seen *164 Donnelly when the latter had departed alone from the bar where they had met that night. Since this version was materially at odds with the one Kearns ventured at trial, the defense employed the contents of the affidavit to attack his credibility. However, while counsel, in his questions on cross-examination, was permitted to incorporate the haec verbae language of this inconsistent statement, the Trial Judge, for the expressed reason that the witness readily conceded its falsity,[2] refused to allow the physical document itself to be introduced into the evidence. The net result was that it was unavailable for inspection by the jury.
To support his argument that the Trial Judge’s banning of the affidavit was grievous error, defendant leans heavily on People v Schainuck (286 NY 161), where the court stated that "the right to scrutinize prior inconsistent statements cannot be cut off by the mere admission by the witness that he has been guilty of inconsistency” (id., at p 165).
But in Schainuck, where the defendant was even precluded from examining the statement, the court also found that defendant had been deprived of a critical "opportunity to compare, detail for detail, the conflicting versions, and to spread them before the jury” (286 NY 161, 165; see People v Hill, 52 AD2d 609, 611; 3A Wigmore, Evidence [Chadbourn rev], § 1037). In contrast, in the present case defense counsel was given, and took, the opportunity to emphasize the glaring inconsistencies by quoting them almost verbatim in framing his questions. The contents of the affidavit having thus found their way into the record, the jurors during their deliberations were privileged, if they so desired, to have had it read to them with or without the testimony which it so dramatically contradicted. Moreover, nothing here indicated the existence of any issue, such as one concerning the writing’s authenticity, form, circumstances of execution, or physical integrity, which might *165 make its facial characteristics relevant. Nor is this an instance in which the subtleties of expression or the omissions and inclusions in the statement required particularly close study of the detail and refinements of composition (cf. Kesten v Forbes, 273 App Div 646, 647 [Sheintag, J.]). Therefore, though a written statement usually will be received when it tends to establish inconsistency, and ordinarily may not be used as a source for cross-examination unless it is (Larkin v Nassau Elec. R. R. Co., 205 NY 267, 269-270), it was not beyond the discretion vouchsafed to a Trial Judge to refuse to allow the defense to put the document in the jury’s hands (see People v Sorge, 301 NY 198, 202).
Finally, we address defendant’s argument that the verdict sheet prepared by the court was so unfair as to have "commanded a conviction”. The sheet listed the offenses submitted to the jury and all possible verdicts that could be reached and, so, fully complied with the letter of CPL 310.20 (subd 2).[3] However, in form, it first enumerated the alternative of finding the defendant "not guilty of anything” and, thereafter, the 15 possible permutations of the charges under which the defendant could be found guilty of one or more. Since this unduly emphasized the options of guilt, we agree that the better course would have been for the court simply to have instructed the jury that it could find the defendant guilty or not guilty on each of the four counts. Nevertheless, in the special circumstances of this case, where, as it turned out, the jury punctuated its deliberations with periodic requests to be reinstructed on each charge, any error inhering in the verdict sheet was harmless.
Before concluding, we further note that, having examined defendant’s remaining contentions, we are of the opinion that each of them is either without merit or rendered academic by the reversal of the arson conviction.
Accordingly, the order of the Appellate Division should be *166 modified to reverse and dismiss the arson count, and otherwise must be affirmed.
Chief Judge Cooke and Judges Jasen, Gabrielli, Jones, Wachtler and Meyer concur.
Order modified in accordance with the opinion herein and, as so modified, affirmed.

. The indictment, which also included a felony murder count, was handed down jointly against father and son, but, after many trial adjournments occasioned by the elder Piazza’s ill health, the cases were severed so that the prosecutor could proceed against the son separately. We are advised that the indictment against Sam Piazza is still pending undetermined.

. It later was to appear that this statement was but one of at least three different accounts emanating from Kearns. One of these surfaced for the first time after the trial and contained an admission that Kearns had been a full participant in Donnelly’s plan to destroy the building and was to share in the latter’s reward for doing so. This revelation led to a CPL 440.10 motion to set aside the judgment because of newly discovered evidence. The Trial Judge denied the motion and the defendant now also appeals from that part of the Appellate Division’s order aifirming that decision. We have made clear that while such a motion is appealable to this court (CPL 450.15, subd 1), it is not reviewable (People v Crimmins, 38 NY2d 407, 409).

. CPL 310.20, insofar as pertinent, provides:
"Upon retiring to deliberate, the jurors may take with them: * * *
"2. A written list prepared by the court containing the offense submitted to the jury by the court in its charge and the possible verdicts thereon.”
Of particular help to juries in multiparty and multicount cases, and in those in which there is a potential for inconsistent verdicts, the statute now expressly permits a practice that had been engaged in by numerous trial courts (McKinney’s Cons Laws of NY, Book 11 A, Commentaries by [now Judge] Richard Denser, p 584; see, generally, 23A CJS, Criminal Law, § 1369, subd d).