**Cyrus Contez HARRISON, Appellant,**

v.

**UNITED STATES, Appellee.**

**Nos. 10–CF–147, 10–CF–148.**

District of Columbia Court of Appeals.

Argued March 6, 2012.

Decided Dec. 20, 2012.

Leila Thamer, Public Defender Service, with whom James Klein and Samia Fam, Public Defender Service, were on the brief, for appellant.

Nicholas Coleman, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, Roy W. McLeese III, Assistant United States Attorney at the time the brief was filed, and John P. Mannarino, Sharad Khandelwal, and Sarah T. Chasson, were on the brief, for appellee.

Before, WASHINGTON, Chief Judge, GLICKMAN, Associate Judge, and REID, Senior Judge.

REID, Senior Judge:

Appellant Cyrus Contez Harrison was convicted by a jury on various charges, including first-degree murder (premeditat-

ed) and obstruction of justice.[1] He challenges the sufficiency of the evidence relating to his obstruction of justice and conspiracy to obstruct justice convictions. In addition, he contends that the trial court committed reversible error in two instances, one relating to an evidentiary ruling and the other to the government's closing argument. For the reasons set forth below, we are constrained to vacate Mr. Harrison's convictions on the conspiracy and obstruction of justice charges, and to remand the case to the trial court with instructions to enter judgment of acquittal as to those charges. However, we affirm all of his other convictions.

## FACTUAL SUMMARY

The government presented testimony and other evidence showing that George Henry Hill was murdered on September 24, 2007, in the Northeast quadrant of the District of Columbia. Dr. Lois Goslinoski, the District's deputy medical examiner, performed an autopsy on Mr. Hill and reported that he suffered five gunshot wounds to his torso (chest, back, abdomen) and left arm. The bullet that entered his back caused "rapidly fatal" injuries to the spinal column, aorta, and the lungs. Dr. Goslinoski recovered two bullets from Mr. Hill's body which she turned over to the Metropolitan Police Department's ("MPD") mobile crime officer assigned to the autopsy.

Keith West, Jr. ("Mr. West Jr."), the government's main witness, was twenty-two years old at the time of trial, and had

been close friends with Mr. Harrison for about ten years. He described the events leading to Mr. Hill's murder. Around 2 p.m. on September 24, 2007, both young men began playing a series of dice games (craps) for money with Mr. Hill. They played into the night, with breaks in between games. During one of the breaks, Mr. Harrison gave Mr. West Jr. a gun to hold for him; Mr. West Jr. placed the gun in a bush near the site of the games. Eventually, a heated argument broke out after Mr. Hill emerged as the victor and decided to leave with the money he had won.[2] In response to Mr. Harrison's request, Mr. West Jr. retrieved the gun, gave it to him, and began walking away. He continued to walk away as he heard the gun cock; soon he heard gunshots, got down on the ground, saw Mr. Harrison chasing Mr. Hill while firing the gun, and watched him stand over and shoot Mr. Hill again.

On October 16, 2007, Mr. West Jr. joined the Army. He was stationed in South Carolina when two MPD detectives visited him on January 11, 2008. They asked him questions about September 24, 2007. At first and for about one hour, Mr. West Jr. lied to them about the events of that day in order to "help" his friend (Mr. Harrison). Mr. West Jr. even invented characters named Mike and Donald whom he placed at the scene during the shooting, and he maintained that he did not know who did the shooting when the detectives pressed him. He changed his mind about

---

1. Mr. Harrison was charged under the following D.C.Code provisions: D.C.Code §§ 22–2101, –4502 (2012 supp.)(first-degree murder while armed–premeditated); § 22–4504(b) (possession of a firearm during a crime of violence or dangerous offense); § 22–4504(a)(carrying a pistol without a license); § 22–1805(a) (obstruction of justice); and § 22–722(a)(2)(A) (conspiracy to obstruct jus-

tice). An indictment containing the obstruction of justice and conspiracy charges was handed down after the first jury was unable to reach a unanimous verdict at Mr. Harrison's first trial on the murder and weapons offenses.

2. Approximately $1900 was found on his person at the time of his death.

telling lies to assist Mr. Harrison and after asking what would happen to his friend, Mr. West Jr. wrote Mr. Harrison's name on a piece of paper, signed and dated it. The detectives recorded what transpired next during the interview, including what Mr. West Jr. said as he identified Mr. Harrison from a photo array. Mr. West Jr. signed a statement prepared from the recording.

Detective Kimberly Lawrence witnessed part of the shooting on September 24, 2007. She had gone to the block where the shooting occurred to serve a subpoena. She heard gunshots and saw one person shooting another individual as the individual fell to the ground. After the victim had fallen to the ground, the shooter fired more shots and then ran off. Although she could see the shooting, which took place about one half block from where she was standing, Detective Lawrence could not see the shooter's facial features, but she described his hairstyle as shoulder-length plats or dreadlocks and his clothing as a black T-shirt, blue jeans and a knitted cap.

Amobi Agu, a man with a history of bank robbery convictions and Mr. Harrison's friend for ten years, entered into a plea agreement with the government with respect to a criminal matter in Virginia, and agreed to testify against Mr. Harrison. He claimed that he regularly played dice with Mr. Harrison and he heard him make incriminating statements after the September 24, 2007, murder of Mr. Hill. He listened as Mr. Harrison (a) described to others how Mr. Hill was crying and begging after he first shot him, and (b) stated that he "hit [Mr. Hill] again" with gunfire. Mr. Agu also personally spoke with Mr. Harrison who explained that Mr. Hill was cheating during the dice games, that Mr. Harrison "got aggravated" and "pulled his gun out and shot him."

MPD Officer Jay Gregory, a crime scene investigator, and Officer Kelvin Dyson of MPD's tactical canine unit revealed what they found at the scene of the crime on September 24. Officer Gregory collected clothing, shell casings, and a round of ammunition. With the help of a dog, Officer Dyson located a handgun.

An independent expert firearms examiner, Michael Mulderig, examined the bullets that Dr. Goslinoski removed from Mr. Hill's body, the shell casings and the 9 millimeter Luger handgun recovered from the crime scene. He testified that the 9 millimeter Luger cartridge casings and ammunition were fired from the 9 millimeter Luger handgun. However, he could not "say for sure that [the bullets] were fired in [the Luger] pistol," but he stated that "the amount of lands and grooves, being eight, and the direction of twist are the only type of lands and grooves that are manufactured in that particular firearm."

## ANALYSIS

### Obstruction of Justice and Conspiracy to Obstruct Justice Convictions

Mr. Harrison argues that his convictions on charges of obstruction of justice and conspiracy to obstruct justice must be reversed because the government "failed to establish beyond a reasonable doubt a crucial element of [these] charges: that [he] possessed the specific intent to prevent [Mr. West Jr.'s] truthful testimony." The government asserts that Mr. Harrison's "argument boils down to an impermissible attempt to substitute [his] own view of the evidence for the permissible inferences that the jury was entitled to draw." The government maintains that the jury could draw reasonable inferences based upon both words used in three telephone conversations between Mr. Harrison and his father, and an in-person conversation be-

tween Mr. Harrison's uncle and Mr. West Jr.'s father.

To provide the factual context for our analysis of the conspiracy and obstruction of justice issues, we set forth the evidence presented by the government at trial. Close to July 6, 2009, the scheduled date of his first trial, Mr. Harrison called his father three times from the D.C. Jail; the calls were recorded by officials at the jail. On June 20, 2009, Mr. Harrison told his father that he needed to talk to him; he also asked his father to tell Dequan (Mr. Harrison's brother) that he "need[ed] Little Keith's (Mr. West Jr.'s) number," and he remarked, "I gotta catch up with Little Keith." In a second call on June 25, 2009, Mr. Harrison referred to Mr. West Jr. as "Shorty" and stated: "They say little Shorty supposed to come back ... Friday [or] Saturday." Mr. Harrison's father declared, "Well, what the hell would he be coming back for?" Mr. Harrison replied that he did not know and was "trying to find out." The father then said, "Oh, that don't, that don't sound good." After recalling that Mr. Harrison was scheduled to go to trial on July 6, the father stated, "I don't know, it might, it might not be, it might not be nothing, though." Mr. Harrison answered, "Uh-huh." The father reiterated, "Well, it might not, yeah, it might not be, it might not be, it might not be nothing." Mr. Harrison asserted, "yeah, I don't know, man. Yeah, I ain't. . . ." The father interrupted saying, "[d]on't even worry about that. It might not be, it might not be, it might not be nothing." Mr. Harrison replied, "Uh-huh."

During a telephone call on July 4, 2009, Mr. Harrison asked his father, "did they ever take care of Shorty?" His father answered, "they talked to his father, right, but I don't think anyone talked directly to him." Mr. Harrison responded, "Yeah."

In addition to the recorded jail telephone conversations between Mr. Harrison and his father, the government presented the testimony of Keith West, Sr. ("Mr. West Sr.") who testified about a conversation he had with Keith Harrison ("Mr. K. Harrison"), appellant's uncle, at a boxing gym around June 2009, prior to appellant's first trial (scheduled to begin on July 6, 2009). At the time of the conversation, Mr. West Sr. had known since April 2009, that his son had to appear in court but he had only a vague understanding about the case. Mr. K. Harrison and Mr. West Sr. attended the same school when they were growing up, and Mr. K. Harrison testified that he went to the boxing gym out of curiosity about the gym. During a 30–minute conversation between the two men, Mr. K. Harrison discussed the murder of Mr. Hill, indicating that appellant was charged with the murder and that Mr. West Jr. "had information connected to that case." Mr. West Sr. "fe[lt] threatened" and "uneasy" when Mr. K. Harrison asked where Mr. West Jr. was and whether he was "coming to court." Mr. K. Harrison said, "all he [Mr. West Jr.] had to do is stay away . . ., then everything will be okay." Mr. West Sr. interpreted these words as "a threat" and he was uneasy because he had other family members who resided in the District.

The August 2009, indictment handed down against Mr. Harrison after his first trial, charged conspiracy and obstruction of justice; it specified five overt acts based upon the telephone calls made by appellant to his father from the D.C. Jail, and the in-person conversation between Mr. K. Harrison and Mr. West Sr. at the boxing gym. At the conclusion of the government's case, appellant moved for judgment of acquittal. The trial court contemplated the "nexus" between the telephone calls from the D.C. Jail and the conversation between Mr. K. Harrison and Mr. West Sr. The court con-

cluded that "[u]nder the circumstances in this case and ... based on the telephone calls that were recorded between [appellant] and his father, there is sufficient evidence where the jury may infer beyond a reasonable doubt that one was the natural occurrence and influenced by the other." The court further determined "that there is sufficient evidence that there was an agreement, there were overt acts that were demonstrated, and the agreement was essentially to prevent the testimony of Mr. West Jr., a witness in this case with respect to the matter that was pending." Hence, the trial court denied the motion for judgment of acquittal.

█ We review the denial of a motion for judgment of acquittal *de novo. See Johnson v. United States,* 756 A.2d 458, 461 (D.C.2000). In addition, when there is a challenge to the sufficiency of the evidence, "[w]e assess the evidence in the light most favorable to the government, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact." *Campos–Alvarez v. United States,* 16 A.3d 954, 964 (D.C.2011)(internal quotation marks and citations omitted). We reverse a conviction for insufficiency of the evidence "[o]nly when there is no evidence from which a reasonable mind might fairly infer guilt beyond a reasonable doubt." *Id.* at 964–65 (internal quotation marks and citations omitted).

In addition to conspiracy to commit a criminal offense, Mr. Harrison was charged under D.C.Code § 22–722(a)(2)(A), which provides:

(a) A person commits the offense of obstruction of justice if that person:

(2) Knowingly uses intimidating or physical force, threatens or corruptly persuades another person, or by threatening letter or communication, endeavors to influence, intimi-

date, or impede a witness or officer in any official proceeding, with intent to:

(A) Influence, delay, or prevent the truthful testimony of the person in an official proceeding.

The trial court correctly instructed the jury that "[t]o prove obstruction of justice the government must prove beyond a reasonable doubt each of the following four elements":

(1) that [Cyrus Harrison] endeavored to influence, intimidate or impede [Mr. West Jr.]

(2) that [Cyrus Harrison] did so by threatening or corruptly persuading [Mr. West Jr.]

(3) that [Cyrus Harrison] did so with the specific intent to influence, delay or prevent [Mr. West Jr.'s] truthful testimony in a proceeding then pending in the Superior Court of the District of Columbia, and

(4) that [Cyrus Harrison] knew or believed that [Mr. West, Jr.] was a witness.

*See Griffin v. United States,* 861 A.2d 610, 614 (D.C.2004) (citation omitted). The court also correctly instructed the jury (in part) that "[t]o prove the offense of conspiracy to obstruct justice the government must prove each of the following three elements beyond a reasonable doubt":

(1) that between—on or about June 1, 2009, and July 6, 2009, an agreement existed between two or more people to commit the offense of obstruction of justice. . . .

(2) that the defendant ... intentionally joined in that agreement. . . . Mere presence at the scene of an agreement ... or merely being with the other participants does not show that the defendant knowingly joined in the agreement. . . .

(3) that one of the people involved in the conspiracy did something for the purpose of carrying out the conspiracy. . . . This something is referred to as an overt act. . . . [The court listed the charged overt acts]

*See Campos–Alvarez, supra,* 16 A.3d at 965 ("In order to prove criminal conspiracy, the government must show: 1) an agreement between two or more people to commit a criminal offense; 2) knowing and voluntary participation in the agreement by the defendant with the intent to commit a criminal objective; and 3) commission in furtherance of the conspiracy of at least one overt act by a co-conspirator during the conspiracy.") (internal quotations and citations omitted).

Here, Mr. Harrison challenges the sufficiency of the government's evidence only with respect to the intent element of the conspiracy and obstruction charges. D.C.Code "§ 22–722(a)(2) requires a specific intent to obstruct justice." *Crutchfield v. United States,* 779 A.2d 307, 325 (D.C.2001) (citations omitted). "Ordinarily, such intent must be inferred from the context and nature of the alleged criminal conduct." *McBride v. United States,* 393 A.2d 123, 131 (D.C.1978).

██ The record in this case contains no direct evidence that Mr. Harrison specifically intended to "influence, delay, or prevent the *truthful testimony*" that Mr. West Jr. was scheduled to give at trial. Consequently, if the government is to prevail on the specific intent element, it must be through indirect or circumstantial evidence based upon reasonable inferences drawn from the factual evidence. We are mindful that "[c]ircumstantial evidence is not intrinsically inferior to direct evidence; [i]n assessing the sufficiency of the government's proof, we make no distinction between direct and circumstantial evidence."

*Bernard v. United States,* 575 A.2d 1191, 1193 (D.C.1990) (citations omitted).

██ The government argues, in essence, that the circumstantial evidence in this case—drawn from reasonable inferences—is sufficient to sustain Mr. Harrison's obstruction of justice and conspiracy charges. It takes the position that the jury could draw reasonable inferences of Mr. Harrison's specific intent from the words used in the three telephone conversations between Mr. Harrison and his father, and from what was said during the in-person conversation between Mr. K. Harrison and Mr. West Sr. We must consider the government's argument against the fundamental standard of proof beyond a reasonable doubt. We emphasized the importance of that standard in *Rivas v. United States,* 783 A.2d 125 (D.C.2001) (en banc): "The reasonable doubt standard of proof requires the factfinder 'to reach a subjective state of near certitude of the guilt of the accused.'" *Id.* at 133 (quoting *Jackson v. Virginia,* 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). "Proof of a fact beyond a reasonable doubt is thus 'more powerful' than proof that the fact is 'more likely true than not,' more powerful, even, than proof 'that its truth is highly probable.'" *Id.* (quoting *(Darius) Smith v. United States,* 709 A.2d 78, 82 (D.C. 1998) (en banc)). "Proof beyond a reasonable doubt . . . furnishes a standard for judicial review of the sufficiency of the evidence." *Id.* at 134 (citing *Jackson, supra,* 443 U.S. at 316–17, 99 S.Ct. 2781). Thus, "[w]e have an obligation to take seriously the requirement that the evidence in a criminal prosecution must be strong enough that a jury behaving rationally could find it persuasive beyond a reasonable doubt." *Id.* We must also take seriously the admonition that "while '[a] jury is entitled to draw a vast range of reasonable inferences from evidence, [it]

may not base a verdict on mere speculation.'" *Id.* (citation omitted). "'The evidence is insufficient if, in order to convict, the jury is required to cross the bounds of permissible inference and enter the forbidden territory of conjecture and speculation.'" *Id.* (citation omitted).

■ In light of the applicable legal principles, we now examine the government's theory of the conspiracy and obstruction charges, and what the prosecutor emphasized in the government's closing and rebuttal arguments to the jury. Again, we focus solely on the intent element of these charges since that is the only element that Mr. Harrison addresses on appeal. With respect to that element, the government had the burden of proving that Mr. Harrison knowingly and voluntarily participated in an agreement with others with the specific intent of influencing or preventing the truthful trial testimony of Mr. West Jr. The prosecutor passed out copies of the transcripts of the telephone calls between Mr. Harrison and his father as the government's closing argument began. The prosecutor told the jury Mr. Harrison's tone of voice in his first call from the jail to his father revealed that he was "trying to hide something." However, the call indicated that Mr. Harrison "need[ed]" to contact Mr. West Jr. and was being "coy" about what he wanted to discuss. The prosecutor again stressed Mr. Harrison's tone of voice in discussing the second call, stating that the tone manifested Mr. Harrison's "fear" of Mr. West Jr.'s testimony against him and his concern that Mr. West Jr. was returning to town close to the beginning of appellant's trial date. According to the prosecutor, the father and son "tr[ied] to convince themselves" that "it might be nothing, but even the defendant is not convinced."

Before discussing the third call from the jail, the prosecutor turned to the conversation between Mr. K. Harrison and Mr. West Sr. and argued that the words, "he should stay away, that everything would be okay" could only be interpreted as "witness tampering"; "the defendant is trying to reach out and prevent [Mr.] West Jr. from testifying." The prosecutor turned to the third call from the jail and said to the jury: "You hear the defendant connecting himself to the conspiracy directly" by using the words "[d]id you ever take care of Shorty?" During rebuttal argument, the prosecutor asserted that the third call from the jail showed that "the defendant is at the center of this conspiracy," that the jury did not "have to have direct evidence" because the jurors "are very much entitled to read between the lines."

Again, we are mindful of our discussion in *Rivas* of the beyond a reasonable doubt standard of proof, as well as the guiding principle that "'[t]he evidence is insufficient if, in order to convict, the jury is required to cross the bounds of permissible inference and enter the forbidden territory of conjecture and speculation.'" *Id.* at 134 (citation omitted). We also are aware of the Supreme Court's guiding statement with respect to the specific intent requirement in proving conspiracy, "we scrutinize the record for evidence of such intent with special care in a conspiracy case for ... charges of conspiracy are not to be made out by piling inference upon inference, thus fashioning ... a dragnet to draw in all substantive crimes." *Anderson v. United States,* 417 U.S. 211, 224, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974) (internal quotation marks and citations omitted). "'[A]n inference is a factual conclusion that can rationally be drawn from other facts.'" *Smith v. State,* 415 Md. 174, 999 A.2d 986, 991 (2010) (quoting Clifford S. Fishman, JONES ON EVIDENCE § 4:1 (7th ed. 1992 & Supp.2009–2010)).

Significantly, as we made clear in *Rivas,* an inference that can sustain a criminal conviction beyond a reasonable doubt is circumscribed. Similarly, the Court of Appeals of New York has declared that although "the proofs are to be taken most favorably to the People, it is with the caveat that the facts and inferences to be drawn from them must be so reasonable that they cannot be confused with mere conjecture or suspicion." *People v. Piazza,* 48 N.Y.2d 151, 422 N.Y.S.2d 9, 397 N.E.2d 700, 704 (1979) (internal quotation marks and citations omitted).

On the record before us, unlike our dissenting colleague, we conclude that "no rational juror could have found beyond a reasonable doubt that" Mr. Harrison, acting through and conspiring with his father and his uncle, had the specific intent to make a threat against Mr. West Jr. to prevent him from giving truthful testimony at Mr. Harrison's trial, thus engaging in conspiracy and obstruction of justice. *Green v. United States,* 651 A.2d 817, 820 (D.C.1994) (citing *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). At least four connected inferences are required to reach the conclusion of guilt beyond a reasonable doubt in this case. The first inference is that in their first telephone conversation, Mr. Harrison asked his father to get Mr. West Jr.'s cell number from Dequan so that he (Mr. Harrison) could prevent Mr. West Jr. from testifying truthfully at the trial, and further, that Mr. Harrison obtained the cell number. However there is no factual evidence, direct or indirect, that Dequan sent Mr. West Jr.'s cell number to Mr. Harrison, or that Mr. Harrison successfully contacted Mr. West Jr. Suspicion or speculation that somehow Mr. Harrison was able to obtain Mr. West Jr.'s cell number is not sufficient to show beyond a reasonable doubt that Mr. Harrison himself made contact with Mr. West Jr.

The second inference, which is related to the first inference, is that because Mr. Harrison "needed" to prevent Mr. West Jr.'s truthful testimony, he somehow conveyed to his own father a request that he enlist the help of Mr. Harrison's uncle, Mr. K. Harrison, to convey the "stay away" message to Mr. West Jr. through his father, Mr. West Sr. But, there is no evidence, direct or indirect, that Mr. K. Harrison went to the boxing gym in response to a request from his nephew. Mr. K. Harrison testified that he went to the gym out of curiosity. Moreover, even assuming he went there for the specific purpose of contacting Mr. West Sr. about Mr. Harrison's trial, the only reasonable inferences on this record (as opposed to speculation and conjecture) are that Mr. K. Harrison went to the gym on his own, or at the request of his brother who was worried about his son (Mr. Harrison). Furthermore, with respect to the government's "tone of voice" inference, we do not agree that there is evidence from which reasonable jurors could infer that Mr. Harrison's tone of voice reflected fear, as the prosecutor argued, fear that Mr. West Jr., who knew what had happened at the crime scene, would testify truthfully against him. While reasonable jurors, listening to the question, "Well, what the hell would he [Mr. West Jr.] be coming back for" uttered by Mr. Harrison's father during the second jail call, might infer some anxiety on the part of the father, Mr. Harrison's words, "I don't know[;][t]hat's what I am trying to find out," reflected neither fear nor anxiety, only a desire to know why his friend, Mr. West Jr. was returning to the area. Furthermore, Mr. Harrison's words show that he tried to calm his own anxiety about his son by saying, "it might not be nothing," and telling his son, "[d]on't even worry about that[,] ... it might be nothing." Mr. Harrison's responsive words to

his father's statements, "Yeah, I don't know man, yeah," yield no reasonable inference that gets us closer to the required standard of proof regarding the intent element of conspiracy and obstruction of justice.

The third asserted inference, connected to the prior asserted inferences, is that Mr. K. Harrison sought out Mr. West Sr. at the behest of Mr. Harrison for the purpose of getting him to tell his son, Mr. West Jr., not to show up at trial to testify against Mr. Harrison. But, as we indicated earlier, there is no evidence, direct or circumstantial, that Mr. Harrison asked his uncle, or attempted to persuade his father to contact Mr. K. Harrison to ask him to request his help in dissuading Mr. West Jr. from appearing as a witness at Mr. Harrison's trial. At most, as we have indicated, there may be a reasonable inference that Mr. K. Harrison acted on his own to "help" his brother (and his nephew) by approaching Mr. West Sr., a man he had known for years, to persuade him to tell his son to "stay away" from Mr. Harrison's trial.

The fourth asserted inference, and one that our dissenting colleague emphasizes, is that Mr. Harrison's inquiry during his third telephone conversation with his father, "did they ever take care of Shorty," was directly connected to the first two telephone calls and proved beyond a reasonable doubt that Mr. Harrison had the specific intent, and had taken steps, to prevent Mr. West Jr.'s truthful testimony against him. While we agree that Mr. Harrison's question may have some probative value, it is of minimal probative value with respect to the required proof beyond a reasonable doubt standard, because of the ambiguity of the words "they" and "take care of." On this record, we may have our suspicions about Mr. Harrison's involvement in an effort to stop Mr. West

Jr. from testifying at Mr. Harrison's trial. But, in our view, the most that one could say on this record is that it may be "more likely than not," or "highly probable," that Mr. Harrison intended, through conversations with his father, to stop Mr. West Jr. from testifying. That is not enough, however, because proof of a fact "beyond a reasonable doubt," is "a more powerful" standard. *Rivas, supra,* 783 A.2d at 133. What the Court of Appeals of New York said in *Piazza, supra,* is equally true here, "on examining the evidence as a whole, the conclusion is inescapable that the circumstantial evidence fell below the standards for determining its sufficiency." 422 N.Y.S.2d 9, 397 N.E.2d at 706.

Our conclusion is supported by two of our cases, *Griffin* and *Green, supra. Griffin* is closely analogous to this case; we reversed appellant's obstruction of justice conviction. There, a witness testified that she saw the defendant/appellant at the D.C. jail. He motioned for her to come over to the glass separating visitors from inmates. The witness complied, and picked up the telephone to communicate with him. He told her to tell a third party to come to court and to tell defense counsel everything that the third party told the police, and that if the third party did not come, "something bad was going to happen to her," "something life-threatening." 861 A.2d at 612. The witness testified that defendant's tone of voice was "regular," but that when she relayed the message to the third party that person looked "scared." *Id.* The government argued that the evidence permitted jurors to draw a reasonable inference that defendant intended to prevent the third party's truthful testimony in his case, based on "(a) [defendant's] statement that [the third party] should 'come down to his court date [for a preliminary hearing] ... and tell his lawyer everything [she] told the police'; (b) his comment that something 'bad' or 'life-

threatening' would happen to [her] if she did not comply with his instruction; and (c) the fact that [the third party] made prior false statements to the police and hence would lie on his behalf at the preliminary hearing." *Id.* at 614. We disagreed and held that there was insufficient evidence to establish defendant's specific intent to influence or prevent the testimony of the third party. We declared, "on this limited and attenuated record, to convict [appellant] of obstructing justice, jurors would have to engage in speculation and the drawing of several inferences which would not comport with the reasonable doubt standard required for criminal conviction." *Id.* at 615.

Here, the government's proof of conspiracy and obstruction of justice is weaker than in *Griffin* because (1) there is no record evidence that Mr. Harrison spoke directly to Mr. West Jr. or to Mr. K. Harrison about Mr. West Jr.'s testimony, (2) no witness testified as to Mr. Harrison's tone of voice during his telephone calls with his father; the government surmised that Mr. Harrison's tone of voice during the second call manifested "fear" of Mr. West Jr.'s truthful testimony; and (3) the words spoken by Mr. K. Harrison to Mr. West Sr. that were designed to influence Mr. West Jr. or to prevent his testimony (if Mr. West Jr. "stay[ed] away," then "everything [would be] okay") are not as graphic as "something bad was going to happen to her," "something life-threatening."

*Green, supra,* also supports our conclusion. There, we reversed one of defendant/appellant Green's obstruction of justice convictions. That case involved Mr. Green, who was estranged from his wife and had been charged criminally for acts against her, and a co-defendant, the husband's friend. The government's evidence consisted of a letter written to Mr. Green's wife stating that if she "d[id] not drop the charges [against her husband], [he] plan[ned] to have something done to [her] and the children." The letter reminded her that she "kn[e]w what [he] did to [her] on West Virginia Avenue when [she] called the police." 651 A.2d at 820. The government conceded that Mr. Green neither wrote the letter nor delivered it to Ms. Green. However, the government contended that the contents of the letter could have been known only to Mr. Green or "a close associate," and that the reasonable inference was that the co-defendant wrote the letter "at Mr. Green's behest." *Id.* We concluded that "there was no evidence fairly allowing a jury to find beyond a reasonable doubt that only [Mr.] Green or someone he caused to write the letter would have known" that Mr. Green and his wife had resided on West Virginia Avenue. *Id.* Significantly, we declared that "while the contents of the ... letter, together with [the co-defendant's] other acts of complicity, made it likely—even highly likely—that [the co-defendant] was the author, that is not the same as proof beyond a reasonable doubt that [the co-defendant] authored the ... letter at the behest of [Mr.] Green." *Id.* Consequently, we asserted, "no rational juror could have found that [Mr.] Green, acting through [his co-defendant] made the threat constituting the obstruction of justice charged [in the count that we reversed]." *Id.* (citing *Jackson, supra,* 443 U.S. at 319, 99 S.Ct. 2781).

As in *Green,* in this case, we see "no evidence fairly allowing a jury to find beyond a reasonable doubt that only [Mr. Harrison]" was the actual source of the "stay away" message conveyed by Mr. K. Harrison to Mr. West Sr. for Mr. West Jr. Hence, consistent with *Green,* we hold that "no rational juror could have found that [Mr. Harrison], acting through Mr. K. Harrison," conveyed the message designed to influence and prevent the testimony of

Mr. West Jr., thus constituting conspiracy and obstruction of justice. Hence, based on the record before us, and on *Griffin* and *Green,* we vacate Mr. Harrison's conspiracy and obstruction of justice convictions, and remand this matter to the trial court with instructions to enter judgment of acquittal on the conspiracy and obstruction of justice charges.

### Prior Consistent Statement

Mr. Harrison challenges the trial court's ruling during the government's redirect examination of Mr. West Jr. By the time of the redirect examination, Mr. West Jr. had been subjected to rigorous cross-examination challenging his credibility. Defense counsel sought to show specific instances in which his grand jury testimony differed from his trial testimony. In response to the cross-examination, the prosecutor posed at least four questions on redirect examination which form the basis for appellant's evidentiary argument on appeal. First, the prosecutor asked: "When's the first time you realized that you had said Mike and Donald in the grand jury?" After the trial court overruled defense counsel's objection, Mr. West Jr. stated: "Probably like right now honestly as I remember." Second, the prosecutor inquired: "Were you trying to mislead the grand jury in any way?" The trial judge overruled defense counsel's objection and Mr. West Jr. replied, "No." In response to the prosecutor's follow-up question, "Why did you tell that to the grand jury then," Mr. West Jr. responded: "Just sticking to the story, you know that I gave to the detectives." The judge sustained defense counsel's objection to the next question as "leading and argumentative." The prosecutor also pressed Mr. West Jr. as to why he had not been truthful in the grand jury as to the identity of the shooter as he eventually was when questioned earlier by the detectives. Mr. West Jr. answered: "I don't know."

Third, the prosecutor asked: "Is that the only thing that you changed about your story?" When the judge overruled the objection, defense counsel requested a bench conference. Defense counsel argued that Mr. West Jr. was "impeached on a very discrete point in the grand jury, and that "it's not fair and lawful rehabilitation to ask him a general question about whether anything else is not accurate in the grand jury." The judge explained that "the [prosecutor's] question is just asked in an open fashion like that without going into specific testimony, it seems to me that's permissible." The judge added: "If [the prosecutor] starts going into the other testimony to repeat, essentially, the consistencies, then that's improper." Fourth, after the bench conference, the prosecutor asked: "Is there anything else that you told the grand jury that wasn't true?" Mr. West Jr. said: "No." The follow-up question was: "And what about the ladies and gentlemen of the jury here, is there anything that you told them today that wasn't the truth … and yesterday?" The judge overruled defense counsel's objection; Mr. West Jr. responded: "No."

Mr. Harrison argues that "[i]nviting [Mr.] West Jr. to affirm that, except for the 'Mike' and 'Donald' impeachment, there were no differences between his grand jury version of the incident and his trial version met no exception to the general rule barring the admissibility of prior consistent statements." He contends that the trial court's "erroneous ruling permitted the government unfairly to bolster [Mr.] West Jr.'s credibility by establishing the fiction he told the grand jury, that two guys named 'Mike' and 'Donald' were at the scene, was the *only* blemish in that account." Moreover, he asserts that the erroneous ruling "strengthened the government's one eyewitness case …, was

highly prejudicial and warrants reversal of the conviction."

■ "The scope of redirect examination rests within the sound discretion of the trial court and will not be reversed absent a showing of clear abuse." *Hairston v. United States*, 497 A.2d 1097, 1103 (D.C.1985). Generally, "prior statements consistent with a witness' trial testimony are inadmissible on the theory that mere repetition does not imply veracity." *Sherer v. United States*, 470 A.2d 732, 740 (D.C.1983) (internal quotation marks and citation omitted). Furthermore, "[t]he exclusion of prior consistent statements is intended to avoid the prejudice of unfairly bolstering the witness' credibility." *Porter v. United States*, 826 A.2d 398, 410 (D.C. 2003). But, we reverse a conviction on grounds of prejudice due to an improper prior consistent statement "only ... where the government's proof of guilt was marginal." *Id.*

■ Here, the prosecutor's redirect examination of Mr. West Jr. was limited mainly to his grand jury testimony relating to "Mike" and "Donald."[3] As in *Sherer, supra,* defense counsel's cross-examination of Mr. West Jr. highlighted and contrasted Mr. West Jr.'s account of Mike and Donald during his grand jury testimony and his trial testimony, obviously to allow the jury to draw the inference that Mr. West Jr.'s "testimony was not credible" due to the discrepancies between the two accounts. 470 A.2d at 740. "The government was entitled to press ... [a different] inference on the jury by trying to show that the discrepancies were trivial when measured against the message of the statement as a whole: that [Mr. Harrison] not someone else," was the shooter. *Id.* at 741. In doing so, the prosecutor did not attempt to rehabilitate Mr. West Jr.'s credibility by eliciting from him specific prior consistent statements he made before the grand jury compared with his trial testimony. Thus, jurors were free to examine Mr. West Jr.'s grand jury and trial statements about the shooting of Mr. Hill and to conduct their own assessment of his credibility. Significantly, Mr. West Jr. never answered the prosecutor's question: "Is that the only thing you changed about your story?" Under the circumstances, and in light of the extensive cross-examination of Mr. West Jr. by defense counsel (designed to cast considerable doubt on his credibility) we cannot say that the trial court abused its discretion in permitting Mr. West Jr.'s challenged redirect examination.

■ But, even assuming abuse of discretion by the trial court because of the application of an incorrect legal principle, our review of the record convinces us that Mr. Harrison suffered no substantial prejudice due to the trial court's ruling. The jury was aware of the close relationship between Mr. Harrison and Mr. West Jr., and the defense presented no persuasive argument as to why he would lie to incriminate his close friend. Although Mr. Harrison portrays Mr. West Jr. as the sole pivotal government witness, the case against him was strong and compelling due to other testimony, including that of Detective Lawrence and Mr. Agu, the evidence collected from the crime scene, the testimony of the firearms expert, and the $1900 found on Mr. Hill's person. Hence, even assuming error by the trial court with respect to the prior consistent statement ruling, the error would be harmless under *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

---

**3.** The prosecutor also posed questions regarding Mr. Harrison's chase of Mr. Hill after their physical struggle, and the direction in which Mr. Harrison ran after the shooting.

### Government's Closing Argument

Finally, Mr. Harrison claims that all of his convictions must be reversed because during the government's closing argument, the trial court allowed the prosecutor to "argue facts not in evidence," thus "artificially bolstering the credibility of its key witness." Mr. Harrison's contention rests on five statements made by the prosecutor during closing argument:

(1) [Mr. West Jr.] didn't know that the officers that night found $1900 among [Mr. Hill's] possessions. He just told you that [Mr. Hill] won [the dice game] and this money corroborates his account.

(2) [The firearms expert] testified and explained that if the gun was already primed for shooting, if the magazine had already been loaded and this racking had occurred, well, then there was already a bullet in the chamber.... Well, that's what the officers found. They found a live round.... This corroborates [Mr. West Jr.'s] account of what happened that night. He heard the gun being racked. He didn't know there was a live round found.

(3) What does the physical evidence tell us? Again, there are two clusters of shell casings .... exactly where ... Mr. West told you the shootings occurred, just a few feet away down the sidewalk. Again—and I can't repeat this enough. He doesn't know—he has never been told that the officers found two clusters of shell casings, he just told you what he saw.

(4) [Mr. West Jr.] told you that he saw the defendant run around to the back of the rec center through the cut. Well, ... that's exactly where the gun is recovered.

(5) That's what [Mr. West Jr.'s] testimony has been. And it's corroborated by the physical evidence, evidence of which he is unaware.

"To evaluate [Mr. Harrison's] claims we first must determine whether the challenged arguments were improper." *Clayborne v. United States*, 751 A.2d 956, 968 (D.C.2000). If the argument is improper, "and if [Mr. Harrison] made a timely objection, then we must determine whether the error was harmless under the familiar *Kotteakos* test." *Id.* Under *Kotteakos, supra*, we examine whether we can conclude "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." 328 U.S. at 765, 66 S.Ct. 1239. In making that assessment, we "tak[e] into account such factors as the gravity of the impropriety in context, the centrality of the issue affected by the error, the effect of any corrective action by the trial judge, and the strength of the government's case." *Clayborne, supra*, 751 A.2d at 968 (citation omitted). We apply the plain error standard if there is no objection. *Id.* "In performing our review, we bear in mind that the trial court has latitude in regulating closing argument, and we do not lightly overturn its discretionary rulings." *Id.* (citing *Irick v. United States*, 565 A.2d 26, 32–33 (D.C. 1989)).

Our first task is to decide whether the prosecutor's challenged closing statements were improper. Of the five statements highlighted by Mr. Harrison, we conclude that only the third is obviously improper. In referring to the clusters of shell casings found at the crime scene, the prosecutor told the jury that Mr. West Jr. had "never been told that officers found two clusters of shell casings." As the government concedes, there is no record evidence to sup-

port this statement. As for the other four statements, we believe that these statements were inartfully phrased by the prosecutor, but as the trial judge pointed out, "the statements that [Mr. West Jr.] didn't know about certain things, for purpose of closing argument, [is] just like saying there's no evidence that he knew about it." Moreover, the $1900, the live round of ammunition found at the crime scene, the place where the gun was found, and the physical evidence all helped to corroborate Mr. West Jr.'s account of the incident. So, we cannot say that four of the statements were improper.

■■■■ Mr. Harrison timely objected to the prosecutor's statement about the clusters of shell casings.[4] Hence we consider the factors we apply where the objection has been timely made. Viewing "the gravity of the impropriety in context," and "the centrality of the issue affected by the error [Mr. West Jr.'s credibility]," *Clayborne, supra,* 751 A.2d at 968, we do not consider the shell casings comment to be grave or to have unduly affected the jury's view of Mr. West Jr.'s credibility, given the strength of the government's case and the trial court's instruction to the jury that its recollection of the evidence should control its deliberations and that the arguments of counsel do not constitute evidence. In short, given the record as a whole, and the trial court's "latitude in regulating closing argument," *id.,* we are satisfied that the judgment in this case "was not substantially swayed by the error." *Kotteakos, supra,* 328 U.S. at 765, 66 S.Ct. 1239.

Accordingly, for the foregoing reasons, we vacate Mr. Harrison's convictions on the charges of conspiracy and obstruction of justice, and remand the case to the trial court with instructions to enter judgment of acquittal as to those counts. However, we affirm all of his other convictions.

*So ordered.*

Opinion by Associate Judge GLICKMAN, concurring and dissenting in part.

GLICKMAN, Associate Judge, concurring in part and dissenting in part:

I would affirm appellant's convictions for obstruction of justice and conspiracy to obstruct justice. In my view, the jury had sufficient evidence to find beyond a reasonable doubt that appellant possessed the necessary intent to prevent Keith West, Jr. ("West") from testifying truthfully at his murder trial. In a telephone conversation recorded on June 25, 2009, appellant and his father worried that West, whom they referred to as "Shorty," would be returning to testify against appellant at his then upcoming trial. Thereafter, in a conversation recorded on July 4 (two days before the scheduled start of the trial), appellant asked his father, "did they ever take care of Shorty?" Appellant's father, manifesting no uncertainty about what his son was asking, answered that "they talked to his [i.e., West's] father." Appellant, in turn, found it unnecessary to ask what "they" talked to West's father about. Plainly, appellant's father was referring to the meeting in which appellant's uncle told

---

4. The government asserts that defense counsel did not make timely objection with respect to three of the statements. However, at the conclusion of the government's closing argument, defense counsel clearly explained his objection to all of the challenged statements. "We have ... relaxed, in the context of closing argument, the conventional requirement that a defendant take his objection at the earliest possible opportunity ... and have held that an appropriate objection or motion at the bench at the conclusion of the prosecutor's presentation is sufficient to preserve the point for appeal." *Hunter v. United States,* 606 A.2d 139, 145 (D.C.1992)(internal quotation marks omitted).

Keith West, Sr. that "everything will be okay" if his son stayed away from appellant's trial.

Surely, from this evidence, the jury reasonably could infer that, prior to July 4, appellant and his father had discussed "tak[ing] care of Shorty" with the help of certain others, including appellant's uncle, and that "tak[ing] care of Shorty" meant inducing West not to appear at appellant's murder trial. In my opinion, the July 4 telephone conversation cannot plausibly be interpreted in any other way. From these inescapable inferences, I submit the jury reasonably could infer that appellant specifically intended that his uncle or another conspirator would take steps to prevent West from testifying truthfully against appellant at his trial. It is possible, I suppose, that appellant was a mere bystander expressing nothing more than a polite, detached interest in an independent effort by his father and uncle to dissuade West from providing crucial evidence against him. But I think the jury was well within its rights to discount that possibility beyond a reasonable doubt.