Quincey D. MITCHELL & Jerome
P. Stroud, Appellants,

v.

UNITED STATES, Appellee.

Nos. 06–CF–418, 06–CF–384.

District of Columbia Court of Appeals.

Argued Jan. 8, 2009.
Decided Dec. 31, 2009.

Mindy A. Daniels, for appellant Quincey D. Mitchell.

Dennis M. Hart, for appellant Jerome P. Stroud.

Suzanne G. Curt, Assistant United States Attorney, with whom Jeffery A. Taylor, United States Attorney at the time the brief was filed, and Elizabeth Trosman and Amanda Haines, Assistant United States Attorneys, were on the brief for appellee.

Before RUIZ, KRAMER and BLACKBURNE–RIGSBY, Associate Judges.

BLACKBURNE–RIGSBY, Associate Judge:

■ This case arises from a July 11, 2004 shooting that was carried out in retaliation for the November 2003 shooting of former Georgetown University basketball player, Victor Paige. On appeal, appellants Quincey D. Mitchell and Jerome P. Stroud, who were convicted of numerous offenses[1] related to the retaliatory shoot-

---

1. Appellants were both found guilty by a jury of conspiracy to commit first-degree murder, D.C.Code § 22–1805(a) (2001); assault with intent to kill while armed (AWIKWA), D.C.Code §§ 22–401 and –4502 (2001); aggravated assault while armed (AAWA),

ing argue that: (1) the trial court erred in denying Mitchell's motion to suppress statements he made to the police; (2) the evidence was insufficient to sustain Stroud's convictions for first-degree murder and aggravated assault,[2] and all of Mitchell's convictions; (3) the trial court erred in denying Mitchell's motion to sever; and (4) the trial court erred in admitting evidence of Stroud's threats against government witnesses for which he was not charged. We affirm.

## I.

The series of events in this case began around 6 p.m. on July 10, 2004 when Linda Thomas received a phone call from a neighbor telling her that the light was on in her black Chevy Tahoe. Ms. Thomas looked outside at her car and saw a man bending down inside the driver's side. There was another man standing in the driver's door of a tan car next to the Tahoe. Both men were black and both were wearing white t-shirts, and one man had "twisters" in his hair. After the man in Ms. Thomas' Tahoe started the car, he got in and drove off with the tan car following.

Around 1 a.m. on July 11, 2004, a group of friends including Michael Simms, Antwain Holroyd, Dwayne Carter, Michael Craig, and Jeffrey Smith, were hanging out in the parking lot of the Parkchester Apartments in Southeast Washington, D.C. As they were talking, Mr. Smith saw two people come from behind the trash dumpsters on the other end of the parking lot. Mr. Smith did not initially recognize the two people, but eventually saw that

D.C.Code §§ 22–404.1 and –4502; possession of a firearm during a crime of violence (PFCV), D.C.Code § 22–4504(b) (2001); carrying a pistol without a license (CPWL), D.C.Code § 22–4504(a); unauthorized use of a motor vehicle (UUV), D.C.Code § 22–1805(a); with respect to Mitchell, two counts of second-degree murder while armed, D.C.Code § 22–1805(a); and with respect to Stroud, two counts of first-degree murder while armed with aggravating circumstances, D.C.Code §§ 22–2101, –2104(b)(6), –4502.

2. Stroud also argues for the first time on appeal that the aiding and abetting instruction given by the court improperly permitted the jury to convict him of the specific intent crimes of first-degree murder and assault with intent to kill while armed. In giving the aiding and abetting instruction, the trial court instructed the jury that, "[it] is not necessary that the defendant have had the same intent that the principal offender had when the crime was committed or that he had intended to commit the particular crime committed by the principal offender."

In *Wilson–Bey v. United States*, 903 A.2d 818, 826 (D.C.2006) (en banc), *cert. denied*, 550 U.S. 933, 127 S.Ct. 2248, 167 L.Ed.2d 1089 (2007), this court determined that a similar instruction was erroneous. Defense counsel did not object to the instruction at trial, however, and therefore we review for plain error. *See Kidd v. United States*, 940 A.2d 118, 126 (D.C.2007). In light of our decision in *Wilson–Bey*, the jury instruction was erroneous, further, the error was plain because "where the law at the time of trial was settled and clearly contrary to the law at the time of appeal—it is enough that an error be 'plain' at the time of appellate consideration." *Johnson v. United States*, 520 U.S. 461, 466, 468, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997). However, we conclude that appellant did not make a specific showing of prejudice to satisfy the "affecting substantial rights" prong of the plain-error rule. *See Kidd, supra*, 940 A.2d at 127. "[I]n order to show that the non-structural error in this case affected his substantial rights, [appellant] must show a reasonable probability that the aiding and abetting jury instruction had a prejudicial effect on the outcome of his trial." *Id.* The government presented evidence that Stroud was avenging his cousin's shooting including, eye witness testimony putting appellant at the scene firing a gun, and testimony that appellant hid a gun at his girlfriend's house after the shooting. Given the strength of the evidence of appellant's intent to kill that the government presented at trial, we conclude that there is not a reasonable probability that the jury convicted appellant on an impermissible negligence theory.

they were appellants, Mitchell and Stroud. As Mitchell raised his hand, Mr. Smith saw that he was holding a gun and Mr. Smith began to run. Mr. Carter's recollection is similar to Mr. Smith's, and he too recognized appellants Mitchell and Stroud. As the appellants emerged from behind the dumpster, they opened fire on the group of men. Mr. Smith was shot in the back of the leg, and Mr. Carter was shot both in the head and the hand. Mr. Holroyd was shot in the back of the head and died where he fell, near Mr. Carter. As Mr. Craig ran, he was shot in the back of the arm and his shoulder. He fell, but got up and continued to run. Mr. Simms was shot in the torso and died a few hours later from the injury.

Metropolitan Police Department Officer William Stokes heard the shots and responded to the scene. As Officer Stokes approached in his police vehicle, he saw two men run out of a driveway and get into a dark Chevrolet SUV with Maryland tags. He further testified that he assumed the men were fleeing from the gunshots, and that when he pulled his police car next to the SUV, the SUV took off at high speed. He pursued the SUV, but saw another individual emerge and begin shooting at the SUV. Officer Stokes stopped his car and saw a victim laying on the ground. He radioed for backup and assisted the victim instead of pursuing the SUV or chasing the other gunman.

Mitchell was arrested two days after the shooting. While *en route* to the homicide branch in the police cruiser, he asked why he was arrested. After FBI Special Agent Dan Sparks told him that he was under arrest for homicide, Mitchell asked, "[W]hen I'mma see my lawyer and my mother[?]" Agent Sparks instructed Mitchell to refrain from speaking until they reached the homicide branch. Mitchell testified that after they reached the homicide branch that he asked again, "when I'mma see my lawyer and my mother." Apparently, upon arriving at the station, the officers who rode in the police cruiser did not tell the officers at the station that Mitchell had asked when he could see his lawyer (and his mother).

At the Metropolitan Police Department station, about an hour after the arrest, Detective Kaufman read Mitchell his *Miranda*[3] rights from a PD–47 card[4] in the presence of Detective Robert Alder. Mitchell answered "yes" to each question, including that he was willing to answer questions without an attorney present. During his eight hours at the homicide branch—four of which were spent speaking with the detectives—Mitchell gave three different versions of his involvement and presence at the scene of the shooting. In the first version, Mitchell claimed that stayed in the car and heard gun shots shortly after Stroud and a third person exited the car and entered the parking lot where the shooting occurred. In his third version, Mitchell told Detectives Alder and Kaufman that he and Stroud "got out the vehicle and walked to the parking lot". After giving the third version admitting his presence at the scene, Mitchell agreed to make a videotaped statement. However, on the videotaped statement, Mitchell stated that while he exited the truck with Stroud and entered the parking lot, Stroud "pulled out the gun and started shooting."

**3.** 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

**4.** Police Department Form 47 ("PD–47"), which is also referred to as a *Miranda* rights waiver card, contains the following questions:

1. Have you read or had read to you the warnings as to your rights?
2. Do you understand these rights?
3. Do you wish to answer any questions?
4. Are you willing to answer questions without having an attorney present?

During the entire time spent at the homicide branch after signing the rights waiver, Mitchell did not request an attorney.

The government's theory at trial was that Stroud, who was Mr. Paige's cousin, engaged appellant Mitchell and Gerard Williams[5] to help him avenge the November 2003 attack on Mr. Paige. The government presented several witnesses to corroborate its theory. Kecia Simms, Michael Simms' mother, testified that on the day of the November 2003 attack on Mr. Paige, she had seen her son's friends, Antoine Holroyd, Jeffrey Smith, and Dewayne Thomas, in a car leaving the scene of Victor Paige's shooting. Ms. Thomas testified that she saw two men who resembled the appellants stealing her black Chevy Tahoe on the evening of the July 2004 shooting. Seteria Johnson testified that she had a relationship with Stroud and that on the night of the July 2004 shooting, Stroud had come to her apartment and asked to hide a gun in her room. Ms. Johnson also testified that before trial, she had been threatened by a person named DeShawn Glover, who told her not to appear in court to testify against Stroud.

## II.

### A. Motion to Suppress

Prior to trial, Mitchell filed a motion to suppress his statements made to the police in which he admitted his presence at the scene of the shooting. Mitchell argued for suppression on the grounds that he was a juvenile at the time of his arrest, the statements were involuntary, and he was denied his request for counsel.

 "In reviewing the denial of a motion to suppress evidence, this court accepts the trial court's factual findings unless they are clearly erroneous or not supported by the record." *Crawford v.*

*United States,* 932 A.2d 1147, 1153 (D.C. 2007) (citing *Ball v. United States,* 803 A.2d 971, 974 (D.C.2002)). We must ensure that there was a substantial basis to support the trial court's legal conclusion that there was no constitutional violation. *Id.* (citing *Brown v. Untied States,* 590 A.2d 1008, 1020 (D.C.1991)). The trial court's legal conclusions are reviewed *de novo. In re G.E.,* 879 A.2d 672, 677 (D.C. 2005).

Here, both appellant Mitchell and Detective Alder testified at the suppression hearing. The trial court found Detective Alder's "testimony to be significantly more credible than [Mitchell's]" as to what was actually said and determined that Mitchell had asked *when* he could see his attorney. The trial court concluded that Mitchell's statement "[W]hen I'mma see my lawyer and my mother[?]" was "equivocal," and that because the statement was equivocal, it did not constitute a request for counsel. Additionally, the trial court found that Mitchell had been read his *Miranda* rights at the police station prior to the commencement of any interrogation and that he had signed the PD–47 card. The court found that Mitchell "understood his rights and he wanted to talk." Based on these findings, the trial court ruled that Mitchell's statements were not taken in violation of his Fifth Amendment right to counsel and were voluntary.

 The record supports the trial court's findings that appellant Mitchell did not request an attorney but merely asked *when* he would see his attorney. We have recognized the deference owed to a trial court's credibility determinations. Here, the trial court made clear that it credited Detective Alder's testimony over Mitchell's as to what was said because Mitchell's testimony was uncertain and "went back

---

5. Gerard Williams was tried separately.

and forth between saying he asked for his attorney and asked *when* he could see his attorney." The trial court's finding is supported by comparing Mitchell's testimony on direct, "I asked them, man, *when* I'mma see my lawyer," and his testimony on cross-examination "I asked for an attorney."

The Supreme Court has held that to invoke the Fifth Amendment right to counsel, the accused must make "an unambiguous or unequivocal request for counsel." *Davis v. United States*, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (finding that " 'maybe I should talk to a lawyer' was not sufficiently clear to establish that [defendant] had invoked his right to counsel"). This means that an accused "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.* at 459. While we have adopted the rule that a request for counsel must be unequivocal, we have not had occasion to address an exhaustive list of what statements constitute an unequivocal request. We have held, for example, that the trial court did not err in ruling that answering "no" to the PD–47 question "Are you willing to answer questions without having an attorney present?" was an invocation of the right to counsel, and that the appellant's response to being asked "Are you sure?" by the interrogating detective was not an initiation of conversation. *In re: G.E., supra,* 879 A.2d at 674, 677–678.

■ We do not need to decide whether appellant's questions here sufficed to invoke the right to counsel because even assuming *arguendo* that appellant Mitch-

ell's statement was an unequivocal request for counsel, any error in denying appellant's motion to suppress was harmless beyond a reasonable doubt as the statements were never admitted into evidence. *See Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). On appeal, Mitchell argues for the first time that he was precluded from putting on an alibi defense because the government stipulated that it would seek to admit his statements to the police in rebuttal if the defense argued that he was not present at the scene of the shooting. There is no indication in the record that Mitchell attempted to proffer any alibi evidence and it is impossible for us to ascertain whether such evidence existed and whether the defense was precluded from using it because of the government's stipulation. We will not engage in factual speculation when considering the harmlessness of an error. *See, e.g., Luce v. United States,* 469 U.S. 38, 41–42, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984) (declining to find harm where the defendant did not testify and the nature of the testimony was speculative). Thus, we conclude that any error was harmless beyond a reasonable doubt because there is no indication in the record that Mitchell's defense was stymied by the trial court's denial of the motion to suppress and the statements where he admitted to being present at the scene were never admitted into evidence.[6]

**B. Sufficiency of the Evidence**

■ In reviewing a claim challenging the sufficiency of the evidence, we must "view the evidence in the light most favorable to the government, giving deference to the fact finder's right to weigh the

6. We further note that the nature of Mitchell's statements was exculpatory and not an admission of guilt in that he denied having a gun or shooting any of the victims and maintained that Stroud acted independently as the trigger man. Therefore, even if the statements had been admitted, their potential harm to Mitchell would have been limited to placing him at the scene (which several witnesses did at trial anyway).

evidence, determine the credibility of the witnesses, and draw inferences from the evidence presented. We can only reverse a conviction on this ground if there is no evidence upon which a reasonable mind could infer guilt beyond a reasonable doubt." *McCullough v. United States*, 827 A.2d 48, 57 (D.C.2003) (quoting *Patton v. United States*, 633 A.2d 800, 820 (D.C. 1993)).

 Mitchell claims that the evidence was insufficient to support his convictions for conspiracy to commit first-degree murder, second-degree murder while armed, assault with intent to kill while armed, aggravated assault while armed, possession of a firearm during a crime of violence, carrying a pistol without a license, and unauthorized use of a motor vehicle. Stroud claims that the evidence did not support his convictions for first-degree murder while armed with aggravating circumstances and aggravated assault while armed. Except with respect to the charges for aggravated assault,[7] the record reflects that there was ample support for each of the charges such that a reasonable jury could have found guilt beyond a reasonable doubt for each conviction. We turn first to the CPWL conviction.

 With regard to the conviction for carrying a pistol without a license, Mitchell argues that the evidence was insufficient to support his conviction for the "firearm offenses." At trial, the government provided, without objection, a Certificate of No Record ("CNR") of a License to Carry a Pistol for each of the appellants.[8] When considering the sufficiency of the evidence presented at trial, we view the evidence "in the light most favorable to the government." *Hicks–Bey v. United States*, 649 A.2d 569, 583 (D.C.1994) (quoting *Jones, supra*, 625 A.2d at 288). "Reversal is permissible on sufficiency grounds only when there is no evidence upon which a reasonable juror could infer guilt beyond a reasonable doubt." *Id.* Moreover, "even

---

7. The government concedes that there was insufficient evidence to prove the requisite element of "serious bodily injury" for aggravated assault. Thus, both appellants' convictions for aggravated assault while armed should be reduced to the lesser-included offenses of assault with a dangerous weapon while armed, as codified in D.C.Code § 22–402 (2001). *See Gathy v. United States*, 754 A.2d 912, 919–20 (2000) (concluding that "[t]he only element distinguishing the greater offense (aggravated assault while armed) from the lesser (ADW) is the requirement of a serious bodily injury, without such an injury, the assault is not 'aggravated' "). Based on the evidence presented at trial establishing the necessary elements for assault with intent to kill while armed and second-degree murder, we conclude that there was sufficient evidence to establish that both appellants committed assault with a dangerous weapon while armed. To establish assault with a dangerous weapon while armed, the government must prove: "(1) an attempt, with force or violence, to injure another person, or a menacing threat, which may or may not be accompanied by a specific intent to injure; (2)

the apparent present ability to injure the victim; (3) a general intent to commit the act or acts which constitute the assault; and (4) the use of a dangerous weapon in committing the assault." *Frye v. United States*, 926 A.2d 1085, 1096 (D.C.2005).

8. We recently held that admission of a CNR without producing the witness who prepared it violates a defendant's Sixth Amendment right to confrontation. *Tabaka v. District of Columbia*, 976 A.2d 173, 175–76 (D.C.2009) (holding that in light of *Melendez–Diaz v. Massachusetts*, ── U.S. ──, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009), CNRs are "inadmissible over objection without corresponding testimony [from the official] who had performed the search"). *Tabaka* explicitly overruled our prior holding in *Millard v. United States*, 967 A.2d 155, 162 (D.C.2009) that "[Certificates of No Record] are not 'testimonial' for purposes of the Sixth Amendment Confrontation Clause". *Id.* However, as appellants did not raise a Confrontation Clause challenge to the introduction of the CNRs at trial or on appeal, we decline to address the Confrontation Clause issue in this opinion.

improperly admitted evidence may be considered in evaluating the sufficiency of the evidence." *Id.* (citing *Lockhart v. Nelson,* 488 U.S. 33, 40–42, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988) ("[A] reversal for insufficiency of the evidence should be treated no differently than a trial court's granting a judgment of acquittal at the close of all the evidence. A trial court in passing on such a motion considers all of the evidence it has admitted, and to make the analogy complete it must be this same quantum of evidence which is considered by the reviewing court.")).

■■■ The CNRs were admitted into evidence without corresponding testimony from the officer who prepared the certificates, and the CNRs were the government's sole evidence that neither of the appellants had a license to carry a pistol. While our recent decision in *Tabaka* held that such evidence is inadmissible over objection without the testimony from the officer who performed the search, no objection was made in this case at trial (nor was the issue raised on appeal), and the certificates were admitted into evidence. *See Tabaka, supra,* 976 A.2d at 176 (reversing a conviction for driving without an operator's permit because the CNR was the only proof of appellant's non-licensure). Under the sufficiency of the evidence standard, the certificates were sufficient to support appellants' CPWL convictions in that a reasonable juror could conclude that neither appellant had a licence to carry a pistol.

■■■ With respect to the remaining counts, the evidence also was sufficient. To sustain a conspiracy conviction, the government must show that (1) an agreement existed between two or more people to commit a criminal offense; (2) the defendant knowingly and voluntarily participated in the agreement with the intent to commit a criminal objective; and (3) a co-conspirator committed at least one overt act in furtherance of and during the conspiracy. *McCullough, supra,* 827 A.2d at 58. A criminal conspiracy does not have to be proven by direct evidence; it may be inferred from a "development and a collocation of circumstances." *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942). Here, both Jeffrey Smith and Dwayne Carter testified that they saw and recognized Mitchell and Stroud when they simultaneously came from behind the trash dumpsters wielding guns. Further, Officer Stokes testified that he noticed a black SUV with its engine running near the scene of the crime, and that he saw two men run from the direction of the Parkchester Apartment's parking lot and get into the SUV. Crediting the reliability of these witnesses' testimony, a jury could reasonably infer from this evidence that Mitchell and Stroud had formed an agreement to carry out an attack on the victims, and that by beginning to shoot, each one had committed an overt act in furtherance of their conspiracy. As such, the evidence was sufficient to support Mitchell's conviction for conspiracy to commit first-degree murder.

■■■ To show that appellant Mitchell committed second-degree murder while armed, the government was required to prove that Mitchell "(1) caused the death of the victim; (2) had the specific intent to kill or commit seriously injure the decedent, or acted in conscious disregard of an extreme risk of death or serious bodily injury to the decedent; and that (3) there were no mitigating circumstances." *See generally Comber v. U.S.,* 584 A.2d 26, 39 (D.C.1990) (en banc) Similarly, "[t]o prove the assault with intent to kill while armed . . . the government [must] show beyond a reasonable doubt that appellant[s]: (1) made an assault; (2) did so with specific intent to kill; (3) while armed." *Tolbert v. United States,* 905 A.2d 186, 189 (D.C.

2006). Again, both Mr. Smith and Mr. Carter, who both suffered injuries, testified that they saw Mitchell shooting at them and the two decedents. Mr. Smith specifically noted that he saw a gun in Mitchell's hand as he raised it to shoot at them, and Mr. Carter testified that he saw Stroud firing a gun. Mr. Simms and Mr. Holroyd died from their gunshot wounds. Of the surviving victims, Mr. Carter was shot in the hand and head, Mr. Smith was shot in the leg, and Mr. Craig was shot in the arm and shoulder. Thus, viewing the evidence in the light most favorable to the government, the evidence was sufficient to sustain Mitchell's convictions for second-degree murder while armed and both appellants' convictions for assault with intent to kill while armed.

■■■■ Appellant Stroud argues that the evidence was insufficient to sustain a first-degree murder while armed with aggravating circumstances convictions because the government did not prove premeditation and deliberation. The government must establish that the defendant "intentionally killed another human being, while armed, with premeditation and deliberate malice." *McCullough, supra,* 827 A.2d 48, 57 (citations omitted). The premeditation element "requires proof that the defendant 'gave thought [before acting] to the idea of taking a human life and reached a definite decision to kill.'" *Id.* (quoting *Harris v. United States,* 668 A.2d 839, 842 (D.C.1995)). Premeditation may be inferred from the circumstances surrounding the murder. *Id.* (citation omitted). In this case, witnesses testified that Stroud was at the scene with a gun, and that he emerged from behind a dumpster and began to shoot without provocation. Also, based on Officer Stokes's testimony, the fact that there was a car waiting with the engine running further supports a finding that the shooting had been planned in advance. This evidence was sufficient for the jury to reasonably infer premeditation and deliberation—an inference the jury appears to have drawn, as shown by the conviction for conspiracy to commit murder. Thus, the evidence was sufficient to support appellant Stroud's conviction for first-degree murder while armed.

■■■■ To prove unauthorized use of a motor vehicle, the government must establish that "(1) appellant took a motor vehicle, or used, operated, or removed a motor vehicle from any place; (2) appellant operated it, drove it, or caused it to be operated or driven for his own profit, use or purpose; (3) appellant did so without the consent of the owner; and (4) at the time appellant took, used, operated, or removed the vehicle, he knew that he did so without the consent of the owner." *Moore v. United States,* 757 A.2d 78, 82 (D.C.2000). Ms. Williams testified that she witnessed her black SUV being stolen by two young black men. Ms. Williams' black SUV was recovered from behind the apartment building of appellant Stroud's girlfriend, Ms. Johnson. Ms. Johnson testified that Stroud had been at her apartment that night. Mr. Smith and Mr. Carter testified that they saw appellant Mitchell and Stroud together during the shooting. Officer Stokes testified that he witnessed two young black men running into a waiting black SUV near the scene of the shooting. Based on this record, there is sufficient evidence to support the jury's finding that Mitchell was guilty of UUV.

■■■■ Mitchell contends that there was insufficient evidence to sustain his conviction for possession of a firearm during a crime of violence. Again, deferring to the jury's prerogative to credit witness testimony, both Mr. Smith and Mr. Carter testified that they saw Mitchell shoot at

them; this testimony alone was sufficient to support a conviction for possession of a firearm during a crime of violence.

### C. Motion for Severance

Appellant Mitchell moved to sever his case from Stroud's based on three pieces of evidence the government sought to introduce to prove the obstruction of justice charges against Stroud.[9] This evidence included inculpatory statements that Stroud made on the telephone from jail, soliciting a third person to warn one of the victims "it ain't good to be 'hot' ",[10] a threat Stroud made via his cousin to a government witness, and letters from Stroud to another inmate threatening to kill Gerard Williams, the alleged third person involved in the shooting. Neither Stroud's telephone statements nor the other evidence presented on his obstruction of justice charges made any reference to Mitchell. Nor were there any obstruction of justice charges filed against Mitchell that the jury could have found substantiated by Stroud's statements.

 We review a denial of a motion for severance for abuse of discretion. *Mitchell v. United States*, 569 A.2d 177, 181 (D.C.1990). A motion for severance is within the sound discretion of the trial court, and we will not reverse the trial court's decision without a clear showing of abuse of discretion. *Brown v. United States*, 934 A.2d 930, 941 (D.C.2007). Only a showing of manifest prejudice will suffice to demonstrate that the trial court abused its discretion in denying a motion for severance. *Hammond v. United States*, 880 A.2d 1066, 1089 (D.C.2005). Absent a showing of undue prejudice, we recognize a preference for jointly trying defendants who are charged with committing a crimi-

nal offense together. *Moore v. United States*, 927 A.2d 1040, 1056 (D.C.2007).

 In ruling to deny appellant Mitchell's motion for severance, the trial court instructed the jury that evidence of the threatening phone call from appellant Stroud was admissible only against Stroud on the obstruction of justice charges, and not against Mitchell. In his final instruction before jury deliberation began, the trial judge reiterated to the jury that there were two separate cases being tried together for the sake of convenience and that "[e]ach defendant is entitled to have his guilt or innocence as to each of the crimes charged to him determined from his own conduct and from the evidence which applies to him as if he was being tried alone." As noted in *McCullough*, we presume that the jury followed the trial judge's instructions. *McCullough, supra*, 827 A.2d at 55. We can discern no abuse of discretion in denying the motion for severance here because the trial court took steps to prevent any undue prejudice towards Mitchell. There is no indication that the jury misused the evidence against Stroud to convict Mitchell, against whom there was independent and ample evidence of guilt.

### D. Obstruction of Justice Charges

 Appellant Stroud was charged with obstruction of justice for attempting to prevent Seretia Johnson from testifying by threatening her life. Stroud asserts that the trial court erred in admitting evidence of other threats that he made against government witnesses, for which he was not charged at trial, because the evidence of those threats contributed to his convictions. Specifically, Stroud classifies the uncharged threats evidence as *Drew*

---

9. Stroud was ultimately acquitted of the obstruction of justice and conspiracy to obstruct justice charges.

10. The government presented evidence that this phrase signifies a threat to someone's life because that person is considered a snitch.

evidence and contends that it was prejudicial and therefore inadmissible. *Drew v. United States*, 118 U.S.App. D.C. 11, 331 F.2d 85 (1964). It is within the trial court's discretion to admit evidence showing that a defendant threatened a witness. *Payne v. United States*, 516 A.2d 484, 491 (D.C.1986). We have made clear that evidence of threats that are directly related or closely intertwined with the understanding of a charged crime does not come within the ambit of "other crimes" evidence that is barred under the *Drew* rule. *Johnson v. United States*, 683 A.2d 1087, 1097 (D.C.1996) (en banc). In *Johnson,* we held that "*Drew* does not apply where such evidence is (1) direct and substantial proof of the charged crime, (2) is closely intertwined with the evidence of the charged crime, or (3) is necessary to place the charged crime in an understandable context." *Id.* at 1098. Stroud fails to acknowledge these exceptions that we

carved out from the *Drew* rule. Here, the threats were admissible because they were "direct and substantial proof of the charged crime." *See id.* at 1097 (citing *Smith v. United States*, 312 A.2d 781, 785 (D.C.1973)). The trial court did not abuse its discretion in admitting evidence of the uncharged threats in this case because those other threats were made against other witnesses to the shooting with which Stroud was charged.

We affirm the convictions of appellants Mitchell and Stroud in all respects except that we reverse and remand with directions to vacate both appellants' convictions for AAWA and direct the trial court to re-sentence appellants accordingly.[11]

*So ordered.*

---

11. Appellants' assault with a dangerous weapon while armed convictions merge with appellants' assault with intent to kill while armed convictions as lesser-included offenses. *See Bolanos v. United States*, 938 A.2d 672 (D.C.2007) (jury convicted appellant of ADW as a lesser-included offense of AWIKWA);

*Sanchez v. United States*, 919 A.2d 1148 (D.C. 2007) (appellant who was indicted on AWIK-WA plead guilty to the lesser-included offense of ADW); *Washington v. United States*, 884 A.2d 1080 (D.C.2005) (appellant acquitted of AWIKWA but convicted of the lesser-included offense of ADW).