# District of Columbia
# Court of Appeals

No. 14-FS-199

IN RE T.M.,



FILED

MAR 16 2017

DISTRICT OF COLUMBIA
COURT OF APPEALS

DEL-1903-13

Appellant.

On Appeal from the Superior Court
of the District of Columbia

BEFORE:   WASHINGTON, *Chief Judge*; BECKWITH, *Associate Judge*; and REID,
*Senior Judge*.

## J U D G M E N T

This case came to be heard on the transcript of record and the briefs filed, and was
argued by counsel.   On consideration whereof, and for the reasons set forth in the
opinion filed this date, it is now hereby

ORDERED and ADJUDGED that appellant's convictions are affirmed, and the
case is remanded solely for the trial court to address those convictions that merge.

For the Court:

JULIO A. CASTILLO
Clerk of the Court

Dated: March 16, 2017.

Opinion for the court by Chief Judge Eric T. Washington.

Opinion by Associate Judge Corinne Beckwith, concurring in part and dissenting in part.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 14-FS-199

IN RE T.M., APPELLANT.

Appeal from the Superior Court of the
District of Columbia
(DEL1903-13)

FILED  **3/16/17**
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

(Hon. Florence Y. Pan, Trial Judge)

(Argued November 4, 2015                    Decided March 16, 2017)

*Claire H. Pavlovic*, Public Defender Service, with whom *James Klein* and *Tejal Kothari*, Public Defender Service, were on the brief, for appellant.

*John J. Woykovsky*, Office of the Attorney General, with whom *Rosalyn Calbert Groce*, Deputy Solicitor General, and *John W. Donovan*, Office of the General Counsel, were on the brief, for appellee.

Before WASHINGTON, *Chief Judge*, BECKWITH, *Associate Judge*, and REID, *Senior Judge*.

Opinion for the court by *Chief Judge* WASHINGTON.

Opinion by *Associate Judge* BECKWITH, concurring in part and dissenting in part, at page 18.

WASHINGTON, *Chief Judge*:    Following a bench trial before the Honorable Florence Y. Pan, appellant T.M. was found delinquent of several charges related to the shooting of seventeen-year-old J.W.  On appeal, appellant challenges the

sufficiency of the evidence to support her conspiracy conviction, and for the first time, raises a facial challenge to the constitutionality of D.C.'s carrying a pistol statute, D.C. Code § 22-4504 (a) (2013), relying primarily on the Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and the D.C. District Court's decision in *Palmer v. District of Columbia*, 59 F. Supp. 3d 173 (D.D.C. 2014).   We affirm.

## I.

On August 30, 2013, T.M. and a group of more than ten teenagers approached J.W., A.L., B.W., L.L., and S.G. in an alley behind Calvin Coolidge High School following a football game.   While in the alley, B.W., J.W., and A.L. identified T.M., who also attended Coolidge High School, as a member of the group of teenagers who approached them. The girls (with the exception of S.G.) testified that they knew T.M. from a prior physical altercation with J.W. the year prior.   J.W., A.L., B.W., L.L., and S.G. proceeded to smoke marijuana in the alley and walk towards the Safeway on Georgia Avenue.   The group of ten or more teenagers, including T.M., followed them down the alley.   A.L. testified that she saw T.M. holding a gun, and "could just tell . . . there was something funny." She also testified that when she turned in the alley, she saw T.M. with her arms

extended and pointing the gun towards them, but slightly down to the ground. A.L. and B.W. testified that before the gun was fired, they heard an unidentified male state, "Don't do it in the light" or "T., if you're going to shoot it, get out of the light."  As the girls crossed the intersection of Tuckerman and Seventh Street, they heard a single gunshot and saw J.W. fall to the ground.  The bullet penetrated both of J.W.'s legs.  A.L., B.W., and S.G. fled to call the police while L.L. remained with the wounded J.W.  The group of teenagers with whom T.M. was seen fled the scene as well.  An ambulance arrived and transported J.W. to Washington Hospital Center, where she received medical treatment for what doctors identified as a broken right leg.

As a result of this incident, T.M. was charged by a twenty-two-count amended indictment with:   (1) two counts of attempted first-degree murder while armed;[1]  (2) five counts of attempted second-degree murder while armed;[2]  (3) two counts of assault with intent to kill while armed ("AWIKWA");[3]  (4) two counts of assault with intent to commit a murder while armed ("AWIMWA");[4]  (5) one

---

[1]  D.C. Code §§ 22-1803, 22-2101, 22-4502 (2012 Repl.).

[2]  D.C. Code §§ 22-1803, 22-2103, 22-4502 (2012 Repl.).

[3]  D.C. Code §§ 22-401, 22-4502 (2012 Repl.).

[4]  *Id.*

count of aggravated assault while armed (AAWA);[5] (6) four counts of attempted AAWA;[6] (7) one count assault with significant bodily injury ("ASBI");[7] (8) one count of conspiracy to commit murder or assault with a dangerous weapon;[8] (9) one count of felony carrying a pistol ("CP");[9] (10) one count of possession of an unregistered firearm ("UF");[10] (11) one count of unlawful possession of ammunition;[11] and (12) one count of discharge of a weapon.[12] At the close of trial, appellant's counsel moved for judgment of acquittal, which was granted as to the attempted first-degree murder while armed, attempted second-degree murder while armed, AWIKWA, and AWIMWA charges, because the government failed to establish the element of intent. On October 31, 2013, the Honorable Florence Y. Pan found appellant delinquent on all remaining counts. On February 5, 2014, appellant was sentenced by the trial court to one year probation. Appellant timely appealed.

## II.

[5] D.C. Code §§ 22-404.01, 22-4502 (2012 Repl.).

[6] D.C. Code §§ 22-404.01, 22-1803, 22-4502 (2012 Repl.).

[7] D.C. Code § 22-404 (a)(2) (2012 Repl.).

[8] D.C. Code § 22-1805a (2012 Repl.).

[9] D.C. Code § 22-4504 (a)(1) (2012 Repl.).

[10] D.C. Code § 7-2502.01 (2013).

[11] D.C. Code § 7-2506.01 (a)(3) (2013).

[12] D.C. Code § 22-4503.01 (2012 Repl.); 24 DCMR § 23001.1.

## A.  Sufficiency of the Evidence

Appellant argues that the evidence presented at trial was insufficient to sustain her conviction for conspiracy to commit murder or assault with a dangerous weapon because the government failed to prove that an agreement was formed between T.M. and the other members of the group present at the scene of the incident.

This court reviews a challenge for sufficiency of the evidence "in the light most favorable to the government, giving full play to the right of the [fact finder] to determine credibility, weigh the evidence, and draw justifiable inferences of fact, and making no distinction between direct and circumstantial evidence." *Gathy v. United States*, 754 A.2d 912, 917 (D.C. 2000) (citation omitted).  "The evidence is insufficient when the government produces no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt." *Bolanos v. United States*, 938 A.2d 672, 677 (D.C. 2007) (citation and internal quotation omitted).

The conspiracy statute, D.C. Code § 22-1805a (a)(1),[13] requires the government to prove that appellant: (1) made "an agreement between [one] or more people to commit a criminal offense; (2) knowing[ly] and voluntar[il]y participat[ed] in the agreement . . . with the intent to commit a criminal objective; and (3) commission[ed] in furtherance of the conspiracy at least one overt act . . . during the conspiracy." *Campos-Alvarez v. United States*, 16 A.3d 954, 965 (D.C. 2011).

In this case, the trial court drew the following inferences from the government's evidence, stating:

> It can be inferred from the words that were used that there was some prior discussion of what was going to happen and that the group that the respondent allegedly was with knew what she was doing based on the statements that were made and then advice was given as to how she should commit the act.

Referencing the advice given to T.M. by the unidentified male at the scene, the

---

[13] "If 2 or more persons conspire either to commit a criminal offense or to defraud the District of Columbia or any court or agency thereof in any manner or for any purpose, each shall be fined not more than the amount set forth in § 22-3571.01 or imprisoned not more than 5 years, or both, except that if the object of the conspiracy is a criminal offense punishable by less than 5 years, the maximum penalty for the conspiracy shall not exceed the maximum penalty provided for that offense." D.C. Code § 22-1805a (a)(1).

trial court went on to state:

> I think that this clearly wasn't her acting alone in that she arrived with a group of people, received encouragement and advice from that group of people. They clearly had been discussing it before she fired the gun, based on the statements that were made, and then they all fled afterward.

Drawing from these inferences and the evidence presented at trial, the trial court found that appellant's conduct satisfied the elements of conspiracy.

Appellant alleges that the trial court relied on nothing more than speculation to satisfy the requirements of D.C. Code § 22-1805a because the evidence presented at trial was insufficient to prove T.M. knowingly participated in an agreement to accomplish the assault against J.W., a necessary element of conspiracy. Notwithstanding this contention, we are satisfied that the inferences drawn by the trial court were reasonable deductions supported by the record. In reaching this conclusion, we look instructively to *Mitchell v. United States*, 985 A.2d 1125, 1135 (D.C. 2009), and *McCoy v. United States*, 890 A.2d 204, 214 (D.C. 2006).

In *Mitchell*, this court concluded that where appellants simultaneously emerged from behind a dumpster while openly wielding guns and followed the

victims down the street on foot, there was no need for direct evidence of agreement and the trial court could permissibly infer from "a development and collocation of circumstances" that appellants formed an agreement to murder the victims. *Mitchell*, 985 A.2d at 1135 (citation and internal quotation omitted). Similarly, in *McCoy*, we held where appellants intentionally followed the victim's car, and one appellant shouted instructions at the other to drive the car in close range of the victim's car, the jury could have reasonably found an agreement existed between the appellants to carry out the shooting. *McCoy*, 890 A.2d at 211, 214.

In this case, the trial court was permitted to draw the same inferences from events preceding the shooting to support her finding of conspiracy. While "mere presence or awareness is insufficient to make out a conviction for . . . conspiracy," *id.* at 211, the trial court in this case found that T.M. arrived in the alley with a large group of teenagers, waited for J.W. and her friends, and promptly followed them down the alley. The evidence also showed that T.M. was openly carrying a weapon when she was seen amongst the group of teenagers and at least one member of the group continued to follow her and advise her on how to carry out the shooting. The statement made by the unidentified male member of the group, advising T.M. not to "do it" in the light, could reasonably indicate that the individual had knowledge of T.M.'s plan to shoot at J.W. and her friends, and

intended to help T.M. carry out the overt act without detection. Much like the instruction given to the appellant in *McCoy*, the advice given to T.M. moments before the shooting could reasonably indicate that the person speaking had knowledge of what "it"—T.M.'s plan to shoot J.W.—was, and thus the person attempted to dissuade T.M. from openly carrying and shooting the gun and intended to participate by walking with and advising T.M. on how to evade detection.

Thus, based on the evidence presented by the government, in conjunction with the reasonable inferences drawn by the trial court, we conclude that there was sufficient evidence to prove that appellant conspired to commit the assaultive act against J.W. and her friends.

## B. Facial Constitutionality of D.C. Code § 22-4504 (a)[14]

---

[14] "(a) No person shall carry within the District of Columbia either openly or concealed on or about their person, a pistol, without a license issued pursuant to District of Columbia law, or any deadly or dangerous weapon. Whoever violates this section shall be punished as provided in § 22-4515, except that: (1) A person who violates this section by carrying a pistol, without a license issued pursuant to District of Columbia law or any deadly or dangerous weapon, in a place other than the person's dwelling place, place of business, or on other land possessed by the person, shall be fined not more than the amount set forth in § 22-3571.01 or imprisoned for not more than 5 years, or both." D.C. Code § 22-4504 (current

(continued . . .)

Next, appellant raises a facial constitutional challenge to the carrying a pistol statute, under which she was found delinquent. We review appellant's constitutional challenge for plain error where, as here, the challenge is raised for the first time on appeal. *See Conley v. United States*, 79 A.3d 270, 276 (D.C. 2013). Under the test for plain error, appellant must show error, that is "plain," that affected her substantial rights, and that seriously affects the fairness, integrity, or public reputation of judicial proceedings. *See Lowery v. United States*, 3 A.3d 1169, 1173 (D.C. 2010) (citing *In re D.B.*, 947 A.2d 443, 450 (D.C. 2008)) (internal quotation marks omitted); *see also United States v. Olano*, 507 U.S. 725 (1993).

Citing *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *Palmer v. District of Columbia*, 59 F. Supp. 3d 173 (D.D.C. 2014),[15] appellant asserts that

---

(continued . . .)
statute) (the "without a license" provision was added in 2012).

[15] In *Palmer v. District of Columbia*, 59 F. Supp. 3d 173 (D.D.C. 2014), *appeal dismissed*, No. 14-7180, 2015 WL 1607711 (D.C. Cir. Apr. 2, 2015), the D.C. District Court reached the issue of the constitutionality of D.C. Code § 22-4504 (a), D.C.'s ban on the carrying of a pistol outside of the home, for the first time since its amendment. Interpreting *District of Columbia v. Heller*, the district court held that the "text and history" of the Second Amendment indicated an intent to protect "carrying" outside of the home for self-defense, as well. Following this analysis, the district court concluded that the District of Columbia's statutory ban on carrying a pistol was an unconstitutional infringement on the Second Amendment, by creating a restriction on the lawful use upon which the right was premised,

(continued . . .)

the trial court's failure to *sua sponte* prohibit the enforcement of the 2013 version of D.C. Code § 22-4504 (a)(1) ("CP statute") constitutes plain error.

In order to prevail on a facial challenge to a statute under plain error review, appellant must demonstrate that: (1) the CP statute was unconstitutional on its face,[16] and thus its enforcement against appellant was error; (2) the constitutional infirmities of the statute were "clear and obvious" at the time of adjudication and/or at the time of appellate review; (3) the enforcement of the statute affected appellant's substantial rights; and (4) the fairness, integrity and public reputation of the judicial proceedings were affected by the error.

In this case, even assuming that the statute was facially unconstitutional, we are satisfied that appellant cannot show that the error was "clear and obvious" either at the time of trial or at the time of appellate review.

_____

(continued . . .)
specifically self-defense.

[16] To demonstrate that the terms of a statute are facially unconstitutional, appellant must show that "measured against the relevant constitutional doctrine, and independent of the constitutionality of particular applications, [the statute] contain[s] a constitutional infirmity that invalidates the statute in its entirety." *Conley*, 79 A.3d at 277.

The 2012 version of the CP statute created a complete restriction on carrying a pistol outside of one's home, with or without a license.[17] *See* Firearms Amendment Act of 2012, 2012 District of Columbia Laws 19-170 ("D.C. Official Code § 22–4504 (a) is amended by striking the phrase 'without a license issued pursuant to District of Columbia law,' wherever it appears.").

Referencing *Heller* as the controlling authority, appellant asks this court to conclude, for the first time, that the Second Amendment prohibits the District of Columbia from enacting a total ban on the possession of a firearm outside of the home. While appellant seems to assert that this conclusion is clearly supported by the Supreme Court's interpretation of the Second Amendment in *Heller* and its subsequent application by the District Court in *Palmer*, this court in *Sims v. United States* illuminated the unsettled posture of the discussion in this court:

---

[17] The Firearms Amendment Act of 2012 struck the phrase "without a license issued pursuant to District of Columbia Law" from "wherever it appear[ed]" in the CPWL statute. Without the license-requirement language, D.C. Code § 22–4504 (a) provided: "No person shall carry within the District of Columbia either openly or concealed on or about their person, a pistol, or any deadly or dangerous weapon capable of being so concealed." Firearms Amendment Act of 2012, D.C. Law 19–170. *See also Snell v. United States*, 68 A.3d 689, 691 n.2 (D.C. 2013); *Wrenn v. District of Columbia*, 2015 WL 3477748, at *1 (D.D.C. May 18, 2015) (for legislative history).

> Important questions about the reach of *Heller* remain to be answered, but what assuredly is not "clear" and "obvious" from the decision is that it dictates an understanding of the Second Amendment which would compel the District to license a resident to carry and possess a handgun outside the confines of his home, however broadly defined.

*Sims v. United States*, 963 A.2d 147, 150 (D.C. 2008); *see also Snell*, 68 A.3d at 693 n.5 (D.C. 2013) ("Whether one has a Second Amendment right to carry a gun outside the home for the purpose of self-defense is an open question in the District.") (citing *Brown v. United States*, 979 A.2d 630, 642 (D.C. 2009)).

After the District dismantled the city's licensing mechanism entirely, the appellant in *Snell* challenged the constitutionality of the felony carrying a pistol without a license ("CPWL") statute because it operated as a total ban on carrying pistols in the District of Columbia. Upon reviewing the constitutionality of that statute, this court concluded:

> If we were to sever the license-requirement language from felony CPWL—as the Council eventually did—the "remaining provision[ ], standing alone, [is] fully operative as a law." *McClough v. United States*, 520 A.2d 285, 289 (D.C. 1987) (internal quotation marks omitted); *see also* D.C. Code § 45–201 (a) (2001). Without the license-requirement language, felony CPWL becomes a blanket prohibition against carrying a pistol outside the home, unless it is registered and being used in compliance with D.C. Code § 22–4504.01 (Supp. 2010). The Council would have prohibited—and eventually did prohibit—this conduct without an exception for

> license-holders, see *supra* notes 2 & 4, and the prohibition does not run afoul of *Heller*, as this court has interpreted it. Although the Council may not institute a wholesale ban on carrying a pistol in one's own home or place of business, *Heller* did not extend one's rights under the Second Amendment to include carrying a pistol outside the home or place of business.

*Snell*, 68 A.3d at 693.

Given the state of this court's case law on the issue, what is clear to us is that at the time of trial, had the trial court surveyed the state of the pertinent case law, it would not have found a clear and definitive answer to the question of *Heller*'s reach. Thus, we conclude that the trial court did not *plainly* err in failing to prohibit the enforcement of the CP statute at trial where it was neither clear nor obvious that the statute was unconstitutional. We now turn to the plainness of the error at the time of appellate review.

Appellant relies alternatively on the D.C. District Court's decision in *Palmer*, which held that the 2012 construction of the CP statute was in fact unconstitutional on its face. *Palmer*, 59 F. Supp. 3d at 183. However, a trial court decision, while persuasive, does not carry the same weight as that of an appellate court decision on the same subject. For that reason, we are not convinced that the district court's decision in *Palmer* is sufficient authority from which this court could conclude that the statute violated appellant's constitutional

rights where there exists contrary authority by our court. More importantly, the U.S. District Court relied primarily on *Peruta v. County of San Diego*, 742 F.3d 1144 (9th Cir. 2014), in support of its decision in *Palmer*. However, *Peruta* was subsequently overturned by the Ninth Circuit, en banc. In its opinion, the Circuit held that the Second Amendment "does not preserve or protect a right of a member of the general public to carry concealed firearms in public." *Peruta v. County of San Diego*, 824 F.3d 919, 924 (9th Cir. 2016), *cert. granted sub nom. Peruta v. California* (U.S. Jan. 17, 2017) (No. 16-894). Thus, any weight that this court would have given to the district court's interpretation of *Heller* in *Palmer* is now significantly less persuasive.

Alternatively, appellant argues that the impropriety of the statute was plain at the time of appeal given the statute's incongruences with constitutional legal principles. While this court, in *Conley*, acknowledged that "the plainness of the error can depend on well-settled legal principles as much as well-settled legal precedents" and such "trial judges are presumed to know and apply the legal principles enunciated in appellate decisions," *Conley*, 79 A.3d at 290, we do not find that appellant's inferences from *Heller*, or subsequent cases interpreting the Second Amendment, constitute "well-settled legal principle[s]" which establish that the right extends outside of the home.

In *Conley*, this court reviewed, for plain error, a facial challenge of D.C. Code § 22-2511, which made it a "a felony offense for a person to be present in a motor vehicle if the person knows that the vehicle contains a firearm, even if the person has no connection to or control over the weapon and is not involved in any wrongdoing whatsoever." *Id.*, 79 A.3d at 272. There, we concluded that the error was clear, given that the statute violated "fundamental principles of due process . . . that were settled long before appellant's trial." *Id.* at 290 (finding an unconstitutional shift in the burden of persuasion to the defense with respect to an essential element of the offense). Unlike the statute we reviewed in *Conley*, however, nothing in the plain language of D.C. Code § 22-4504 (a)(1) appears to violate core and well-settled due process principles that should have put the trial court on notice that the statute's enforcement violated constitutional norms.

Therefore, the question before us is whether the law is well settled enough to have made it clear and obvious to the trial court that enforcement of D.C. Code § 22-4504 (a)(1) violated appellant's Second Amendment right to bear arms. After reviewing this court's case law cited above and the case law of other jurisdictions, we are satisfied that the language of the statute was not so clearly and obviously unconstitutional as to support reversal on plain error grounds. *See*

*United States v. Masciandaro*, 638 F.3d 458, 467 (4th Cir. 2011) ("A considerable degree of uncertainty remains as to the scope of [the *Heller*] right beyond the home and the standards for determining whether and how the right can be burdened by governmental regulation."); *see also Kachalsky v. County of Westchester*, 701 F.3d 81, 89 (2d Cir. 2012) ("What we know from [*Heller* and *McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010)] is that Second Amendment guarantees are at their zenith within the home . . . . What we do not know is the scope of that right beyond the home and the standards for determining when and how the right can be regulated by a government.") (citation omitted).

## III.

Because it is unclear whether D.C. Code § 22-4505(a) (2012 Repl.) violates appellant's Second Amendment rights and because the evidence presented at trial was sufficient to sustain appellant's conviction for conspiracy to commit the assault on J.W., we affirm appellant's convictions and remand the case solely for the trial court to address those convictions that merge.[18]

---

[18] Appellant's conviction for felony assault (also called assault with significant bodily injury or "ASBI") merges with her conviction for AAWA because felony assault is a lesser-included offense of AAWA. *See Medley v. United States*, 104 A.3d 115, 132 (D.C. 2014) ("ASBI is a lesser-included offense

(continued . . .)

*So ordered.*


BECKWITH, *Associate Judge*, concurring in part and dissenting in part:    The government's evidence in this case showed that after a group of teenage girls—including the complainants J.W., B.W., A.L., and L.L.—left a Friday night football game at Coolidge High School, they went into an alley and smoked marijuana.    Another group of young people was also hanging out in the alley, and B.W. testified that she recalled seeing appellant T.M. in that group, holding a small black gun.    At some point, when the group of girls left the alley and walked down Tuckerman Street, B.W. looked back, saw that T.M. was behind them with a gun, and alerted her friends that "she about to bust a gun" or "she's about to shoot the gun."    According to the government's witnesses, T.M. had separated herself from the group of people with whom she had been walking, crossed the street to the side

---

(continued . . .)

of aggravated assault."). Additionally, appellant's four convictions for attempted AAWA merge with her conviction for AAWA against J.W., because all four attempt convictions originated from one single assaultive act, the shooting of the weapon. The government does not contest the merger of these convictions. Thus, we vacate appellant's four convictions for attempted AAWA and felony assault (ASBI). Because this case involves a juvenile, there is no need to remand because the sentence will not be affected. *See In re T.H.B.*, 670 A.2d 895, 903 (D.C. 1996) ("When a juvenile is found guilty of two or more criminal offenses, the court does not sentence that juvenile separately on each count as it would sentence an adult. Rather, an adjudication of delinquency is a single, unitary judgment.") (citing D.C. Code § 16–2320 (c) (1989); Super. Ct. Juv. R. 32 (b)).

J.W. and her friends were on, and raised her right arm in a slightly downward angle toward J.W.'s group. Witnesses described hearing a male voice say, "T., if you're going to shoot it, then get out the light" or "Don't do it in the light." A shot rang out and everyone except J.W., who was struck by the bullet in both legs, and L.L., who stayed with J.W., ran away.

On this evidence, the trial court found T.M. guilty of several assault and gun charges. The court also found her guilty of conspiracy—that is, of entering an agreement to commit this criminal offense. D.C. Code § 22-1805a. The court reached this conclusion after rejecting T.M.'s motion for judgment of acquittal on the conspiracy count on the ground that "it can be inferred from the words that were used that there was some prior discussion of what was going to happen" and that the people T.M. was with "knew what she was going to do based on the statements that were made and then advice was given as to how she should commit the act, if you're going to do it, don't do it in the light." Because this ruling constitutes a far-reaching and, in my view, unwarranted extension of what our prior decisions have regarded as sufficient evidence of the agreement that is necessary for conspiracy, I respectfully dissent from my colleagues' decision to affirm T.M.'s conviction for conspiracy here. I join the court's rejection on plain error review of T.M.'s Second Amendment challenge to D.C. Code § 22-4504 (a),

and would therefore affirm the trial court's judgment in all other respects.

The first element of the offense of conspiracy is "an agreement between [one] or more people to commit a criminal offense." *Campos-Alvarez v. United States*, 16 A.3d 954, 965 (D.C. 2011). This court has described this agreement as the "essence" of the crime of conspiracy, *Wilson-Bey v. United States*, 902 A.2d 818, 841 (D.C. 2006) (en banc), and whether the evidence established such an agreement here is the key disputed issue in T.M.'s challenge to the sufficiency of the evidence.

In concluding that the government had proven the existence of an agreement beyond a reasonable doubt, the court ruled:

> I think that this clearly wasn't her acting alone in that she arrived with a group of people, received encouragement and advice from that group of people. They clearly had been discussing it before she fired the gun, based on the statements that were made, and then they all fled afterward. So I find that that is sufficient to find beyond a reasonable doubt that there was an agreement with other people to commit this act and that those other people were involved in planning the attack. It wasn't something that was done impulsively. There was following of the victims from the alley and there was discussion as to how it should be done and where it should be done.

The court thus relied primarily upon three facts: (1) that T.M. was with a group of people who walked behind the complainants as they emerged from an alley and walked down Tuckerman Street behind them; (2) that before T.M. fired the gun toward J.W. and her group, an unidentified male stated either "Don't do it in the light" or "T., if you're going to shoot it, get out of the light;" and (3) that after the shooting, T.M.'s associates fled. More specifically, the trial court concluded that it could reasonably infer, based on the unidentified male's statement—"Don't do it in the light" or "T., if you're going to shoot it, get out of the light"—that T.M. had "some prior discussion" that evinced an agreement to commit the offense.

In either form this statement was something less than an agreement, or even an endorsement. The question, then, is whether the trial court could fairly infer from this statement, and from the hazy evidence of the movements and actions of T.M.'s group before and after the shooting, that T.M. formed an agreement with another person to commit the assault in this case.[1] An agreement that forms a conspiracy does not have to be proven by direct evidence. *Castillo-Campos v.*

---

[1] The centrality of the statement to the trial court's ultimate ruling is made clear by the court's observation, in the course of an evidentiary ruling, that "there [was] not independent evidence"—without the statement—"that would prove a conspiracy by a preponderance of the evidence."

*United States*, 987 A.2d 476, 482 (D.C. 2010). "[T]he evidence supporting a conspiracy conviction nearly always is circumstantial because there is rarely in a conspiracy case direct evidence of the conspiracy or proof of declarations." *Wheeler v. United States*, 977 A.2d 973, 982 n.19 (D.C. 2009). In general, however, "an inference that can sustain a criminal conviction beyond a reasonable doubt is circumscribed," *Harrison v. United States*, 60 A.3d 1155, 1164 (D.C. 2012), and as the Supreme Court has cautioned, "charges of conspiracy are not to be made out by piling inference upon inference, thus fashioning . . . a dragnet to draw in all substantive crimes," *Anderson v. United States*, 417 U.S. 211, 224 (1974) (internal quotation marks and citations omitted).

Contrary to the trial court's reasoning here, it is impossible for a rational juror to conclude beyond a reasonable doubt, based on the fact that an unidentified male told T.M. to "get out of the light" if she was going to shoot the gun, that T.M. and this male—or T.M. and somebody else—engaged in "some prior discussion" during which they formed an agreement to commit the shooting.

As an initial matter, it is uniquely difficult to infer an agreement in circumstances where only the alleged principal is charged with conspiracy, where the alleged coconspirator's identity, possible motives, and relationship to the

principal are unknown and completely undeveloped at trial, and where the principal's conduct was a single assaultive act that could have been spontaneously committed and did not necessarily contemplate the need for cooperation. At a more fundamental level, the inferences the trial court had to make in order to conclude that T.M. formed an agreement to commit the assault were speculative and therefore not reasonable. The evidence established at most that another person who was expecting T.M. to shoot a gun gave her advice about how to avoid detection. But proof that someone believed T.M. was preparing to fire a gun and did not want her to be seen doing so is not tantamount to proof that T.M. and this person had formed an agreement to commit the offense. As my colleagues in the majority acknowledge, "mere presence or awareness is insufficient to make out a conviction for . . . conspiracy." *Ante* at 8 (quoting *McCoy v. United States*, 890 A.2d 204, 211 (D.C. 2006). Even if the trial court were correct that the unidentified speaker's words suggested that T.M. had discussed the shooting with the speaker, the record is still devoid of any basis for inferring that the two formed an agreement to commit the offense.

The trial court discerned evidence of an agreement in the fact that the person who told T.M. not to shoot the gun in the light helped her commit the shooting by giving her "encouragement and advice." In the court's view, aiding and abetting

was the same as conspiring in this case, "because if you're assisting her in doing it and wanting it to come about, why isn't that the same as agreeing with her that it should be done and helping her make it come about[?]"  Even assuming the evidence was sufficient to establish that telling T.M. to stay out of the light "if you're going to shoot it"—an instruction T.M. ignored—constituted aiding and abetting, the trial court's suggestion that one who aids and abets a shooter must also have formed an agreement with that shooter is the opposite of what our case law says and is not substantiated by the record in this case.   "[B]oth the Supreme Court and this court . . . have emphasized that [conspiracy] liability and aiding and abetting are distinct legal theories that require proof of different elements." *Wilson-Bey*, 903 A.2d at 839.  Aiding and abetting has "a broader application" than conspiracy, and "makes a defendant a principal when he consciously shares in any criminal act whether or not there is a conspiracy."  *Nye & Nissan v. United States*, 336 U.S. 613, 620 (1949).  Nothing in the record supports a reasonable inference that the speaker here formed a mutual agreement with T.M. or did anything more than provide unilateral advice.

The court's holding allowing the conspiracy conviction in this case to stand also conflicts markedly with our existing case law on conspiracy.   In *Harrison v. United States*, 60 A.3d at 1162-67, for example, Cyrus Contez Harrison was

convicted of conspiracy to obstruct justice (as well as the substantive offense of obstruction of justice) based on three recorded phone calls he made to his father from the D.C. Jail. 60 A.3d at 1159-60. In these phone calls he asked his father to get the phone number of "Little Keith," a friend of Mr. Harrison and a potential witness against him at trial; stated that he was trying to find out why Little Keith had come back to town; and asked his father, "[D]id they ever take care of [Little Keith]?" *Id.* at 1160. His father replied, "[T]hey talked to his father, right, but I don't think anyone talked directly to him." *Id.* Other testimony showed that Mr. Harrison's uncle had spoken to Little Keith at Little Keith's boxing gym, where he asked if Little Keith was "coming to court" and stated that "all he [Little Keith] had to do is stay away . . . then everything will be okay." *Id.* (ellipsis in original). The court held that no rational juror could have found Mr. Harrison guilty beyond a reasonable doubt, as "the most that one could say on this record is that it may be 'more likely than not,' or 'highly probable,'" that he conspired with his father to influence or prevent Little Keith's truthful testimony.[2] *Id.* at 1164-65. The guilty verdict required inferences as to Mr. Harrison's intentions, the existence and content of his unattested communications with his uncle, his uncle's intentions, and

---

[2] The court analyzed Mr. Harrison's arguments in terms of the specific intent element of both the conspiracy and obstruction of justice charges, but its analysis here is equally applicable to the "agreement" element of the offense of conspiracy.

the meaning of the words "they" and "take care of"; "on examining the evidence as a whole, the conclusion [was] inescapable that the circumstantial evidence fell below the standards for determining its sufficiency." *Id.* at 1165 (quoting *People v. Piazza*, 397 N.E.2d 700, 706 (N.Y. 1979)).

The trial court's finding that T.M. had entered an agreement to commit the shooting in this case stemmed from far more conjectural inferences than those deemed insufficient to support the conspiracy conviction in *Harrison*. To find T.M. guilty of conspiracy, a factfinder would have to infer from the evidence that T.M. considered shooting J.W. before the unidentified male saw her with the gun and made the statement, that she discussed her plan with him, and that they agreed explicitly or implicitly that she would carry out the shooting. As in *Harrison*, it is possible things happened that way. But also as in *Harrison*, a rational factfinder had no basis for reaching that conclusion beyond a reasonable doubt.

My colleagues in the majority do not grapple with *Harrison* or say how it can be distinguished. They conclude instead that the trial court here drew "the same inferences" that were drawn in two other cases in which this court rejected sufficiency-of-the-evidence challenges to conspiracy convictions in the absence of direct evidence of an agreement. Yet these two cases—*McCoy v. United States*,

890 A.2d 204 (D.C. 2006), and *Mitchell v. United States*, 985 A.2d 1125 (D.C. 2009)—feature very specific evidence enabling the factfinder to draw reasonable nonspeculative inferences regarding the existence of an agreement. The inferences in *McCoy* and *Mitchell* cannot be fairly likened to the trial court's inference here that T.M. must have entered an agreement with the person who suggested that she get out of the light. Given the glaring absence in this record of the kind of evidence of conspiracy the government presented in *McCoy* and *Mitchell*, these cases support T.M.'s sufficiency challenge more than they undermine it.

In *McCoy*, the case on which the government primarily relies, the government presented evidence that a group of friends—comprised of appellants Edward McCoy and Darryl Woodard and two of their friends, Jerome Edwards and Todd Lawton—engaged in a fist fight with another group of friends at a nightclub. 890 A.2d at 207. Sometime later on, Mr. McCoy, Mr. Woodard, Mr. Edwards, and Mr. Lawton went to the parking lot and got into a Volvo. According to Mr. Lawton, the Volvo did not leave the parking lot until a Chevrolet driven by Michael Cary, a member of the group Mr. McCoy's group had fought with, drove off, at which point the Volvo chased Mr. Cary's car at high speeds. *Id.* at 207, 214. Mr. Lawton testified that as the Volvo caught up to Mr. Cary's car, Mr.

McCoy screamed instructions to Mr. Edwards, the driver, to stay even with the Chevrolet through a tunnel. *Id.* at 214. Mr. Edwards did so, and Mr. McCoy shot at Mr. Cary out of the Volvo's passenger-side window. *Id.* The court held that this evidence was sufficient to permit a reasonable juror to infer that Mr. McCoy conspired with Mr. Edwards to assault Mr. Cary with a dangerous weapon. *Id.*

The proof that Mr. McCoy entered an agreement to commit the shooting undoubtedly depended upon various inferences. The reasonableness of those inferences is rock-solid, however, compared to the speculative leap required to convict T.M. of conspiracy here. As T.M. points out in her reply brief, the court in *McCoy*, in finding sufficient evidence of an agreement, relied upon evidence of shared motive (stemming from the two men's involvement in a fist fight with the complainant) and coordinated action (in the extent to which Mr. Edwards and Mr. McCoy worked together to accomplish the assault) that is completely lacking in the present case. *Mitchell*, the other case the majority relies upon, likewise upheld a conspiracy conviction based on evidence that the appellants worked together to shoot multiple victims: they emerged simultaneously from behind trash dumpsters wielding guns, committed the shooting, got into an SUV, and fled together. 985 A.2d at 1135. In T.M.'s case, by contrast, the record is devoid of

evidence that T.M. shared a motive with the unidentified male, or that the two acted in concert. Indeed, she disregarded the one instruction the person gave her. *See United States v. Moss*, 591 F.2d 428, 435 (8th Cir. 1979) (stating that "[t]here must exist some element of affirmative cooperation or agreement to cooperate in the object of the conspiracy" and that neither "mere association with an individual engaged in an illegal enterprise" or "mere knowledge, approval or acquiescence in the object of an alleged conspiracy sufficient to render an individual a part of a conspiracy").

The existence of an agreement between T.M. and at least one other person, in the sense of a "joint commitment" to a criminal endeavor, is not a mere technicality but "the fundamental characteristic of a conspiracy." *Ocasio v. United States*, 136 S. Ct. 1423, 1429 (2016). "The essential element of conspiracy is the agreement to commit an unlawful act, which distinguishes it from other substantive offenses and aiding and abetting that do not require proof of an agreement." *Pearsall v. United States*, 812 A.2d 953, 961 (D.C. 2002) (citation omitted). *See also Wilson-Bey*, 903 A.2d at 841 ("[T]he agreement is the 'essence' or 'gist' of the crime of conspiracy." (quoting 2 Wayne R. LaFave, Substantive Criminal Law § 12.2(a) (2d ed. 2003))). As the evidence in this case did not approximate what our case law requires to demonstrate beyond a

reasonable doubt that T.M. formed an agreement to commit the shooting in this case, I respectfully dissent from the court's holding to the contrary.